*144 Justice Alito
delivered the opinion of the Court.
This case arises out of a decision by the Animal and Plant Health Inspection Service (APHIS) to deregulate a variety of genetically engineered alfalfa. The District Court held that APHIS violated the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U. S. C. §4321 et seq., by issuing its deregulation decision without first completing a detailed assessment of the environmental consequences of its proposed course of action. To remedy that violation, the District Court vacated the agency’s decision completely deregulating the alfalfa variety in question; ordered APHIS not to act on the deregulation petition in whole or in part until it had completed a detailed environmental review; and enjoined almost all future planting of the genetically engineered alfalfa pending the completion of that review. The Court of Appeals affirmed the District Court’s entry of permanent injunctive relief. The main issue now in dispute concerns the breadth of that relief. For the reasons set forth below, we reverse and remand for further proceedings.
I
A
The Plant Protection Act (PPA), 114 Stat. 438, 7 U. S. C. §7701 et seq., provides that the Secretary of the Department of Agriculture (USDA) may issue regulations “to prevent the introduction of plant pests into the United States or the dissemination of plant pests within the United States.” § 7711(a). The Secretary has delegated that authority to APHIS, a division of the USDA. 7 CFR §§ 2.22(a), 2.80(a)(36) (2010). Acting pursuant to that delegation, APHIS has promulgated regulations governing “the introduction of organisms and products altered or produced through genetic engineering that are plant pests or are believed to be plant pests.” See § 340.0(a)(2), and n. 1. Under those regulations, certain genetically engineered plants are presumed to be “plant pests” — and thus “regulated articles” *145 under the PPA — until APHIS determines otherwise. See ibid.; §§340.1, 340.2, 340.6; see also App. 183. However, any person may petition APHIS for a determination that a regulated article does not present a plant pest risk and therefore should not be subject to the applicable regulations. 7 U. S. C. § 7711(c)(2); 7 CFR § 340.6. APHIS may grant such a petition in whole or in part. § 340.6(d)(3).
In deciding whether to grant nonregulated status to a genetically engineered plant variety, APHIS must comply with NEPA, which requires federal agencies “to the fullest extent possible” to prepare an environmental impact statement (EIS) for “every recommendation or report on proposals for legislation and other major Federal actio[n] significantly affecting the quality of the human environment.” 42 U. S. C. § 4332(2)(C). The statutory text “speaks solely in terms of proposed actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions.” Kleppe v. Sierra Club, 427 U. S. 390, 410, n. 20 (1976).
An agency need not complete an EIS for a particular proposal if it finds, on the basis of a shorter “environmental assessment” (EA), that the proposed action will not have a significant impact on the environment. 40 CFR §§ 1508.9(a), 1508.13 (2009). Even if a particular agency proposal requires an EIS, applicable regulations allow the agency to take at least some action in furtherance of that proposal while the EIS is being prepared. See § 1506.1(a) (“[N]o action concerning the proposal shall be taken which would: (1) Have an adverse environmental impact; or (2) Limit the choice of reasonable alternatives”); § 1506.1(c) (“While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action” satisfies certain requirements).
*146 B
This case involves Roundup Ready Alfalfa (RRA), a kind of alfalfa crop that has been genetically engineered to be tolerant of glyphosate, the active ingredient of the herbicide Roundup. Petitioner Monsanto Company (Monsanto) owns the intellectual property rights to RRA. Monsanto licenses those rights to co-petitioner Forage Genetics International (FGI), which is the exclusive developer of RRA seed.
APHIS initially classified RRA as a regulated article, but in 2004 petitioners sought nonregulated status for two strains of RRA. In response, APHIS prepared a draft EA assessing the likely environmental impact of the requested deregulation. It then published a notice in the Federal Register advising the public of the deregulation petition and soliciting public comments on its draft EA. After considering the hundreds of public comments that it received, APHIS issued a “Finding of No Significant Impact” and decided to deregulate RRA unconditionally and without preparing an EIS. Prior to this decision, APHIS had authorized almost 300 field trials of RRA conducted over a period of eight years. App. 348.
Approximately eight months after APHIS granted RRA nonregulated status, respondents (two conventional alfalfa seed farms and environmental groups concerned with food safety) filed this action against the Secretary of Agriculture and certain other officials in Federal District Court, challenging APHIS's decision to completely deregulate RRA. Their complaint alleged violations of NEPA, the Endangered Species Act of 1973 (ESA), 87 Stat. 884, 16 U. S. C. § 1531 et seq., and the PPA. Respondents did not seek preliminary injunctive relief pending resolution of those claims. Hence, RRA enjoyed nonregulated status for approximately two years. During that period, more than 3,000 farmers in 48 States planted an estimated 220,000 acres of RRA. App. 350.
*147 In resolving respondents’ NEPA claim, the District Court accepted APHIS’s determination that RRA does not have any harmful health effects on humans or livestock. App. to Pet. for Cert. 43a; accord, id., at 45a. Nevertheless, the District Court held that APHIS violated NEPA by deregulating RRA without first preparing an EIS. In particular, the court found that APHIS’s EA failed to answer substantial questions concerning two broad consequences of its proposed action: first, the extent to which complete deregulation would lead to the transmission of the gene conferring glyphosate tolerance from RRA to organic and conventional alfalfa; and, second, the extent to which the introduction of RRA would contribute to the development of Roundup-resistant weeds. Id., at 52a. In light of its determination that the deregulation decision ran afoul of NEPA, the District Court dismissed without prejudice respondents’ claims under the ESA and PPA.
After these rulings, the District Court granted petitioners permission to intervene in the remedial phase of the lawsuit. The court then asked the parties to submit proposed judgments embodying their preferred means of remedying the NEPA violation. APHIS’s proposed judgment would have ordered the agency to prepare an EIS, vacated the agency’s deregulation decision, and replaced that decision with the terms of the judgment itself. Id., at 184a (proposed judgment providing that “[the federal] defendants’ [June 14,] 2005 Determination of Nonregulated Status for Alfalfa Genetically Engineered for Tolerance to the Herbicide Glyphosate is hereby vacated and replaced by the terms of this judgment” (emphasis added)). The terms of the proposed judgment, in turn, would have permitted the continued planting of RRA pending completion of the EIS, subject to six restrictions. Those restrictions included, among other things, mandatory isolation distances between RRA and non-genetically-engineered alfalfa fields in order to mitigate the risk of gene flow; mandatory harvesting conditions; a re *148 quirement that planting and harvesting equipment that had been in contact with RRA be cleaned prior to any use with conventional or organic alfalfa; identification and handling requirements for RRA seed; and a requirement that all RRA seed producers and hay growers be under contract with either Monsanto or FGI and that their contracts require compliance with the other limitations set out in the proposed judgment.
The District Court rejected APHIS’s proposed judgment. In its preliminary injunction, the District Court prohibited almost all future planting of RRA pending APHIS’s completion of the required EIS. But in order to minimize the harm to farmers who had relied on APHIS’s deregulation decision, the court expressly allowed those who had already purchased RRA to plant their seeds until March 30, 2007. Id., at 58a. In its subsequently entered permanent injunction and judgment, the court (1) vacated APHIS’s deregulation decision; (2) ordered APHIS to prepare an EIS before it made any decision on Monsanto’s deregulation petition; (3) enjoined the planting of any RRA in the United States after March 30, 2007, pending APHIS’s completion of the required EIS; and (4) imposed certain conditions (suggested by APHIS) on the handling and identification of already-planted RRA. Id., at 79a, 109a. The District Court deified petitioners’ request for an evidentiary hearing.
The Government, Monsanto, and FGI appealed, challenging the scope of the relief granted but not disputing the existence of a NEPA violation. See Geertson Seed Farms v. Johanns, 570 F. 3d 1130, 1136 (2009). A divided panel of the Court of Appeals for the Ninth Circuit affirmed. Based on its review of the record, the panel first concluded that the District Court had “recognized that an injunction does not ‘automatically issue’ when a NEPA violation is found” and had instead based its issuance of injunctive relief on the four-factor test traditionally used for that purpose. Id., at 1137. The panel held that the District Court had not com *149 mitted clear error in making any of the subsidiary factual findings on which its assessment of the four relevant factors was based. And the panel rejected the claim that the District Court had not given sufficient deference to APHIS’s expertise concerning the likely effects of allowing continued planting of RRA on a limited basis. In the panel’s view, APHIS’s proposed interim measures would have perpetuated a system that had been found by the District Court to have caused environmental harm in the past. Id., at 1139. Hence, the panel concluded that the District Court had not abused its discretion “in choosing to reject APHIS’s proposed mitigation measures in favor of a broader injunction to prevent more irreparable harm from occurring.” Ibid.
The panel majority also rejected petitioners’ alternative argument that the District Court had erred in declining to hold an evidentiary hearing before entering its permanent injunction. Writing in dissent, Judge N. Randy Smith disagreed with that conclusion. In his view, the District Court was required to conduct an evidentiary hearing before issuing a permanent injunction unless the facts were undisputed or the adverse party expressly waived its right to such a hearing. Neither of those two exceptions, he found, applied here.
We granted certiorari. 558 U. S. 1142 (2010).
II
A
At the threshold, respondents contend that petitioners lack standing to seek our review of the lower court rulings at issue here. We disagree.
Standing under Article III of the Constitution requires that an injury be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling. Horne v. Flores, 557 U. S. 433, 445 (2009). Petitioners here satisfy all three criteria. Petitioners are injured by their inability to sell or license *150 RRA to prospective customers until such time as APHIS completes the required EIS. Because that injury is caused by the very remedial order that petitioners challenge on appeal, it would be redressed by a favorable ruling from this Court.
Respondents do not dispute that petitioners would have standing to contest the District Court’s permanent injunction order if they had pursued a different litigation strategy. Instead, respondents argue that the injury of which petitioners complain is independently caused by a part of the District Court’s order that petitioners failed to challenge, namely, the vacatur of APHIS’s deregulation decision. The practical consequence of the vacatur, respondents contend, was to restore RRA to the status of a regulated article; and, subject to certain exceptions not applicable here, federal regulations ban the growth and sale of regulated articles. Because petitioners did not specifically challenge the District Court’s vacatur, respondents reason, they lack standing to challenge a part of the District Court’s order (i. e., the injunction) that does not cause petitioners any injury not also caused by the vacatur. See Brief for Respondents 19-20.
Respondents’ argument fails for two independent reasons. First, although petitioners did not challenge the vacatur directly, they adequately preserved their objection that the vacated deregulation decision should have been replaced by APHIS’s proposed injunction. Throughout the remedial phase of this litigation, one of the main disputes between the parties has been whether the District Court was required to adopt APHIS’s proposed judgment. See, e. g., IntervenorAppellants’ Opening Brief in No. 07-16458 etc. (CA9), p. 59 (urging the Court of Appeals to “vacate the district court’s judgment and remand this case to the district court with instructions to enter APHIS’s proposed relief”); Opening Brief of Federal Defendants-Appellants in No. 07-16458 etc. (CA9), pp. 21, 46 (“The blanket injunction should be narrowed in accordance with APHIS’s proposal”); see also Tr. of *151 Oral Arg. 6, 25-27, 53-54. That judgment would have replaced the vacated deregulation decision with an order' expressly allowing continued planting of RRA subject to certain limited conditions. App. to Pet. for Cert. 184a (proposed judgment providing that “[the federal] defendants’ 14 June 2005 Determination of Nonregulated Status for Alfalfa Genetically Engineered for Tolerance to the Herbicide Glyphosate is hereby vacated and replaced by the terms of this judgment” (emphasis added)). Accordingly, if the District Court had adopted the agency’s suggested remedy, there would still be authority for the continued planting of RRA, because there would, in effect, be a new deregulation decision.[1]
Second, petitioners in any case have standing to challenge the part of the District Court’s order enjoining partial deregulation. Respondents focus their standing argument on the part of the judgment enjoining the planting of RRA, but the judgment also states that “[b]efore granting Monsanto’s deregulation petition, even in part, the federal defendants shall prepare an environmental impact statement.” Id., at 108a (emphasis added); see also id., at 79a (“The Court will enter a final judgment... ordering the government to prepare an EIS before it makes a decision on Monsanto’s deregulation petition”). As respondents concede, that part of the judgment goes beyond the vacatur of APHIS’s deregulation decision. See Tr. of Oral Arg. 37, 46.
At oral argument, respondents contended that the restriction on APHIS’s ability to effect a partial deregulation of RRA does not cause petitioners “an actual or an imminent harm.” Id., at 39-40. In order for a partial deregulation to occur, respondents argued, the case would have to be remanded to the agency, and APHIS would have to prepare an *152 EA “that may or may not come out in favor of a partial deregulation.” Id., at 40. Because petitioners cannot prove that those two events would happen, respondents contended, the asserted harm caused by the District Court’s partial deregulation ban is too speculative to satisfy the actual or imminent injury requirement.
We reject this argument. If the injunction were lifted, we do not see why the District Court would have to remand the matter to the agency in order for APHIS to effect a partial deregulation. And even if a remand were required, we perceive no basis on which the District Court could decline to remand the matter to the agency so that it could determine whether to pursue a partial deregulation during the pendency of the EIS process.
Nor is any doubt as to whether APHIS would issue a new EA in favor of a partial deregulation sufficient to defeat petitioners’ standing. It is undisputed that petitioners have submitted a deregulation petition and that a partial deregulation of the kind embodied in the agency’s proposed judgment would afford petitioners much of the relief that they seek; it is also undisputed that, absent the District Court’s order, APHIS could attempt to effect such a partial deregulation pending its completion of the EIS. See id., at 7-8, 25-27,38. For purposes of resolving the particular standing question before us, we need not decide whether or to what extent a party challenging an injunction that bars an agency from granting certain relief must show that the agency would be likely to afford such relief if it were free to do so. In this case, as is clear from APHIS’s proposed judgment and from its briefing throughout the remedial phase of this litigation, the agency takes the view that a partial deregulation reflecting its proposed limitations is in the public interest. Thus, there is more than a strong likelihood that APHIS would partially deregulate RRA were it not for the District Court’s injunction. The District Court’s elimination of that likelihood is plainly sufficient to establish a con *153 stitutionally cognizable injury. Moreover, as respondents essentially conceded at oral argument, that injury would be redressed by a favorable decision here, since “vacating the current injunction . . . will allow [petitioners] to go back to the agency, [to] seek a partial deregulation,” even if the District Court’s vacatur of APHIS’s deregulation decision is left intact. Id., at 39. We therefore hold that petitioners have standing to seek this Court’s review.[2]
B
We next consider petitioners’ contention that respondents lack standing to seek injunctive relief. See Daimler-Chrysler Corp. v. Cuno, 547 U. S. 332, 352 (2006) (“[A] plaintiff must demonstrate standing separately for each form of relief sought” (internal quotation marks omitted)). Petitioners argue that respondents have failed to show that any of the named respondents is likely to suffer a constitutionally cognizable injury absent injunctive relief. See Brief for Petitioners 40. We disagree.
Respondents include conventional alfalfa farmers. Emphasizing “the undisputed concentration of alfalfa seed farms,” the District Court found that those farmers had “established a ‘reasonable probability’ that their organic and conventional alfalfa crops will be infected with the engineered gene” if RRA is completely deregulated. App. to Pet. for Cert. 50a.[3] A substantial risk of gene flow injures *154 respondents in several ways. For example, respondents represent that, in order to continue marketing their product to consumers who wish to buy non-genetically-engineered alfalfa, respondents would have to conduct testing to find out whether and to what extent their crops have been contaminated. See, e. g., Record, Doc. 62, p. 5 (Declaration of Phillip Geertson in Support of Plaintiffs’ Motion for Summary Judgment) (Geertson Declaration) (“Due to the high potential for contamination, I will need to test my crops for the presence of genetically engineered alfalfa seed. This testing will be a new cost to my seed business and we will have to raise our seed prices to cover these costs, making our prices less competitive”); id., Doc. 57, p. 4 (Declaration of Patrick Trask in Support of Plaintiff’s Motion for Summary Judgment) (“To ensure that my seeds are pure, I will need to test my crops and obtain certification that my seeds are free of genetically engineered alfalfa”); see also id., Doc. 55, p. 2 (“[T]here is zero tolerance for contaminated seed in the organic market”). Respondents also allege that the risk of gene flow will cause them to take certain measures to minimize the likelihood of potential contamination and to ensure an adequate supply of non-genetically-engineered alfalfa. See, e. g., Geertson Declaration 3 (noting the “increased cost of alfalfa breeding due *155 to potential for genetic contamination”); id., at 6 (“Due to the threat of contamination, I have begun contracting with growers outside of the United States to ensure that I can supply genetically pure, conventional alfalfa seed. Finding new growers has already resulted in increased administrative costs at my seed business”).
Such harms, which respondents will suffer even if their crops are not actually infected with the Roundup Ready gene, are sufficiently concrete to satisfy the injury-in-fact prong of the constitutional standing analysis. Those harms are readily attributable to APHIS’s deregulation decision, which, as the District Court found, gives rise to a significant risk of gene flow to non-genetically-engineered varieties of alfalfa. Finally, a judicial order prohibiting the growth and sale of all or some genetically engineered alfalfa would remedy respondents’ injuries by eliminating or minimizing the risk of gene flow to conventional and organic alfalfa crops. We therefore conclude that respondents have constitutional standing to seek injunctive relief from the complete deregulation order at issue here.
Petitioners appear to suggest that respondents fail to satisfy the “zone of interests” test we have previously articulated as a prudential standing requirement in cases challenging agency compliance with particular statutes. See Reply Brief for Petitioners 12 (arguing that protection against the risk of commercial harm “is not an interest that NEPA was enacted to address”); Bennett v. Spear, 520 U. S. 154, 162-163 (1997). That argument is unpersuasive because, as the District Court found, respondents’ injury has an environmental as well as an economic component. See App. to Pet. for Cert. 49a. In its ruling on the merits of respondents’ NEPA claim, the District Court held that the risk that the RRA gene conferring glyphosate resistance will infect conventional and organic alfalfa is a significant environmental effect within the meaning of NEPA. Petitioners did not appeal that part of the court’s ruling, and we have no occasion to *156 revisit it here. Respondents now seek injunctive relief in order to avert the risk of gene flow to their crops — the very-same effect that the District Court determined to be a significant environmental concern for purposes of NEPA. The mere fact that respondents also seek to avoid certain economic harms that are tied to the risk of gene flow does not strip them of prudential standing.
In short, respondents have standing to seek injunctive relief, and petitioners have standing to seek this Court’s review of the Ninth Circuit’s judgment affirming the entry of such relief. We therefore proceed to the merits of the case.
Ill
A
The District Court sought to remedy APHIS’s NEPA violation in three ways: First, it vacated the agency’s decision completely deregulating RRA; second, it enjoined APHIS from deregulating RRA, in whole or in part, pending completion of the mandated EIS; and third, it entered a nationwide injunction prohibiting almost all future planting of RRA. Id., at 108a-110a. Because petitioners and the Government do not argue otherwise, we assume without deciding that the District Court acted lawfully in vacating the deregulation decision. See Tr. of Oral Arg. 7 (“[T]he district court could have vacated the order in its entirety and sent it back to the agency”); accord, id., at 15-16. We therefore address only the latter two aspects of the District Court’s judgment. Before doing so, however, we provide a brief overview of the standard governing the entry of injunctive relief.
B
“[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remediés available at law, such as monetary damages, are inadequate to compensate for that injury; *157 (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.” eBay Inc. v. MercExchange, L. L. C., 547 U. S. 388, 391 (2006). The traditional four-factor test applies when a plaintiff seeks a permanent injunction to remedy a NEPA violation. See Winter v. Natural Resources Defense Council, Inc., 555 U. S. 7, 31-33 (2008).
Petitioners argue that the lower courts in this case proceeded on the erroneous assumption that an injunction is generally the appropriate remedy for a NEPA violation. In particular, petitioners note that the District Court cited preWinter Ninth Circuit precedent for the proposition that, in “'the run of the mill NEPA case,’” an injunction delaying the contemplated government project is proper '"until the NEPA violation is cured.’ ” App. to Pet. for Cert. 65a (quoting Idaho Watersheds Project v. Hahn, 307 F. 3d 815, 833 (CA9 2002)); see also App. to Pet. for Cert. 55a (quoting same language in preliminary injunction order). In addition, petitioners observe, the District Court and the Court of Appeals in this case both stated that, “in unusual circumstances, an injunction may be withheld, or, more likely, limited in scope” in NEPA eases. Id., at 66a (quoting National Parks & Conservation Assn. v. Babbitt, 241 F. 3d 722, 737, n. 18 (CA9 2001); internal quotation marks omitted); 570 F. 3d, at 1137.
Insofar as the statements quoted above are intended to guide the determination whether to grant injunctive relief, they invert the proper mode of analysis. An injunction should issue only if the traditional four-factor test is satisfied. See Winter, supra, at 31-33. In contrast, the statements quoted above appear to presume that an injunction is the proper remedy for a NEPA violation except in unusual circumstances. No such thumb on the scales is warranted. Nor, contrary to the reasoning of the Court of Appeals, could any such error be cured by a court’s perfunctory recognition *158 that “an injunction does not automatically issue” in NEPA cases. See 570 F. 3d, at 1137 (internal quotation marks omitted). It is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should not issue; rather, a court must determine that an injunction should issue under the traditional four-factor test set out above.
Notwithstanding the lower cpurts’ apparent reliance on the incorrect standard set out in the pre-Winter Circuit precedents quoted above, respondents argue that the lower courts in fact applied the traditional four-factor test. In their view, the statements that injunctive relief is proper in the “run-of-the-mill” NEPA case, and that such injunctions are granted except in “unusual circumstances,” are descriptive rather than prescriptive. See Brief for Respondents 28, n. 14. We need not decide whether respondents’ characterization of the lower court opinions in this case is sound. Even if it is, the injunctive relief granted here cannot stand.
C
We first consider whether the District Court erred in enjoining APHIS from partially deregulating RRA during the pendency of the EIS process.[4]
The relevant part of the District Court’s judgment states that, “[bjefore granting Monsanto’s deregulation petition, even in part, the federal defendants shall prepare an envi *159 ronmental impact statement.” App. to Pet. for Cert. 108a (emphasis added); see also id., at 79a (“The Court will enter a final judgment. . . ordering the government to prepare an EIS before it makes a decision on Monsanto’s deregulation petition”). The plain text of the order prohibits any partial deregulation, not just the particular partial deregulation embodied in APHIS’s proposed judgment. We think it is quite clear that the District Court meant just what it said. The related injunction against planting states that “no [RRA]... may be planted” “[u]ntil the federal defendants prepare the EIS and decide the deregulation petition.” Id., at 108a (emphasis added). That injunction, which appears in the very same judgment and directly follows the injunction against granting Monsanto’s petition “even in part,” does not carve out an exception for planting subsequently authorized by a valid partial deregulation decision.
In our view, none of the traditional four factors governing the entry of permanent injunctive relief supports the District Court’s injunction prohibiting partial deregulation. To see why that is so, it is helpful to understand how the injunction prohibiting a partial deregulation fits into the broader dispute between the parties.
Respondents in this case brought suit under the Administrative Procedure Act (APA) to challenge a particular agency order: APHIS’s decision to completely deregulate RRA. The District Court held that the order in question was procedurally defective, and APHIS decided not to appeal that determination. At that point, it was for the agency to decide whether and to what extent it would pursue a partial deregulation. If the agency found, on the basis of a new EA, that a limited and temporary deregulation satisfied applicable statutory and regulatory requirements, it could proceed with such a deregulation even if it had not yet finished the onerous EIS required for complete deregulation. If and when the agency were to issue a partial deregulation order, any party aggrieved by that order could bring a separate suit *160 under the APA to challenge the particular deregulation attempted. See 5 U. S. C. § 702.
In this ease, APHIS apparently sought to “streamline” the proceedings by asking the District Court to craft a remedy that, in effect, would have partially deregulated RRA until such time as the agency had finalized the EIS needed for a complete deregulation. See Tr. of Oral Arg. 16, 23-24; App. to Pet. for Cert. 69a. To justify that disposition, APHIS and petitioners submitted voluminous documentary submissions in which they purported to show that the risk of gene flow would be insignificant if the District Court allowed limited planting and harvesting subject to APHIS’s proposed conditions. Respondents, in turn, submitted considerable evidence of their own that seemed to cut the other way. This put the District Court in an unenviable position. “The parties’ experts disagreed over virtually every factual issue relating to possible environmental harm, including the likelihood of genetic contamination and why some contamination had already occurred.” 570 F. 3d, at 1135.
The District Court may well have acted within its discretion in refusing to craft a judicial remedy that would have authorized the continued planting and harvesting of RRA while the EIS is being prepared. It does not follow, however, that the District Court was within its rights in enjoining APHIS from allowing such planting and harvesting pursuant to the authority vested in the agency by law. When the District Court entered its permanent injunction, APHIS had not yet exercised its authority to partially deregulate RRA. Until APHIS actually seeks to effect a partial deregulation, any judicial review of such a decision is premature.[5]
*161 Nor can the District Court’s injunction be justified as a prophylactic measure needed to guard against the possibility that the agency would seek to effect on its own the particular partial deregulation scheme embodied in the terms of APHIS’s proposed judgment. Even if the District Court was not required to adopt that judgment, there was no need to stop the agency from effecting a partial deregulation in accordance with the procedures established by law. Moreover, the terms of the District Court’s injunction do not just enjoin the particular partial deregulation embodied in APHIS’s proposed judgment. Instead, the District Court barred the agency from pursuing any deregulation — no matter how limited the geographic area in which planting of RRA would be allowed, how great the isolation distances mandated between RRA fields and fields for growing non-genetically-engineered alfalfa, how stringent the regulations governing harvesting and distribution, how robust the enforcement mechanisms available at the time of the decision, and — consequently—no matter how small the risk that the planting authorized under such conditions would adversely affect the environment in general and respondents in particular.
*162 The order enjoining any partial deregulation was also inconsistent with other aspects of the very same judgment. In fashioning its remedy for the NEPA violation, the District Court steered a “middle course” between more extreme options on either end. See id., at 1136. On the one hand, the District Court rejected APHIS’s proposal (supported by petitioners) to allow continued planting and harvesting of RRA subject to the agency’s proposed limitations. On the other hand, the District Court did not bar continued planting of RRA as a regulated article under permit from APHIS, see App. to Pet. for Cert. 75a, and it expressly allowed farmers to harvest and sell RRA planted before March 30, 2007, id., at 76a-79a. If the District Court was right to conclude that any partial deregulation, no matter how limited, required the preparation of an EIS, it is hard to see why the limited planting and harvesting that the District Court allowed did not also require the preparation of an EIS. Conversely, if the District Court was right to conclude that the limited planting and harvesting it allowed did not require the preparation of an EIS, then an appropriately limited partial deregulation should likewise have been possible.
Based on the analysis set forth above, it is clear that the order enjoining any deregulation whatsoever does not satisfy the traditional four-factor test for granting permanent injunctive relief. Most importantly, respondents cannot show that they will suffer irreparable injury if APHIS is allowed to proceed with any partial deregulation, for at least two independent reasons.
First, if and when APHIS pursues a partial deregulation that arguably runs afoul of NEPA, respondents may file a new suit challenging such action and seeking appropriate preliminary relief. See 5 U. S. C. §§702, 705. Accordingly, a permanent injunction is not now needed to guard against any present or imminent risk of likely irreparable harm.
Second, a partial deregulation need not cause respondents any injury at all, much less irreparable injury; if the scope *163 of the partial deregulation is sufficiently limited, the risk of gene flow to their crops could be virtually nonexistent. For example, suppose that APHIS deregulates RRA only in a remote part of the country in which respondents neither grow nor intend to grow non-genetically-engineered alfalfa, and in which no conventional alfalfa farms are currently located. Suppose further that APHIS issues an accompanying administrative order mandating isolation distances so great as to eliminate any appreciable risk of gene flow to the crops of conventional farmers who might someday choose to plant in the surrounding area. See, e. g., Brief in Opposition 9, n. 6 (quoting study concluding “ ‘that in order for there to be zero tolerance of any gene flow between [an RRA] seed field and a conventional seed field, those fields would have to have a five-mile isolation distance between them’ ”); see also Tr. of Oral Arg. 15-16 (representation from the Solicitor General that APHIS may impose conditions on the deregulation of RRA via issuance of an administrative order). Finally,suppose that APHIS concludes in a new EA that its limited deregulation would not pose a significant risk of gene flow or harmful weed development, and that the agency adopts a plan to police vigorously compliance with its administrative order in the limited geographic area in question. It is hard to see how respondents could show that such a limited deregulation would cause them likely irreparable injury. (Respondents in this case do not represent a class, so they could not seek to enjoin such an order on the ground that it might cause harm to other parties.) In any case, the District Court’s order prohibiting any partial deregulation improperly relieves respondents of their burden to make the requisite evidentiary showing.[6]
*164 Of course, APHIS might ultimately choose not to partially deregulate RRA during the pendency of the EIS, or else to pursue the kind of partiál deregulation embodied in its proposed judgment rather than the very limited deregulation envisioned in the above hypothetical. Until such time as the agency decides whether and how to exercise its regulatory authority, however, the courts have no cause to intervene. Indeed, the broad injunction entered here essentially preempts the very procedure by which the agency could determine, independently of the pending EIS process for assessing the effects of a complete deregulation, that a limited deregulation would not pose any appreciable risk of environmental harm. See 40 CFR §§ 1501.4, 1508.9(a) (2009).
In sum, we do not know whether and to what extent APHIS would seek to effect a limited deregulation during the pendency of the EIS process if it were free to do so; we do know that the vacatur of APHIS’s deregulation decision means that virtually no RRA can be grown or sold until such time as a new deregulation decision is in place, and we also know that any party aggrieved by a hypothetical future deregulation decision will have ample opportunity to challenge it, and to seek appropriate preliminary relief, if and when such a decision is made. In light of these particular circumstances, we hold that the District Court did not properly exercise its discretion in enjoining a partial deregulation of any kind pending APHIS’s preparation of an EIS. It follows that the Court of Appeals erred in affirming that aspect of the District Court’s judgment.
*165 D
We now turn to petitioners’ claim that the District Court erred in entering a nationwide injunction against planting RRA. Petitioners argue that the District Court did not apply the right test for determining whether to enter permanent injunctive relief; that, even if the District Court identified the operative legal standard, it erred as a matter of law in applying that standard to the facts of this case; and that the District Court was required to grant petitioners an evidentiary hearing to resolve contested issues of fact germane to the remedial dispute between the parties. We agree that the District Court’s injunction against planting went too far, but we come to that conclusion for two independent reasons.
First, the impropriety of the District Court’s broad injunction against planting flows from the impropriety of its injunction against partial deregulation. If APHIS may partially deregulate RRA before preparing a full-blown EIS — a question that we need not and do not decide here — farmers should be able to grow and sell RRA in accordance with that agency determination. Because it was inappropriate for the District Court to foreclose even the possibility of a partial and temporary deregulation, it necessarily follows that it was likewise inappropriate to enjoin any and all parties from acting in accordance with the terms of such a deregulation decision.
Second, respondents have represented to this Court that the District Court’s injunction against planting does not have any meaningful practical effect independent of its vacatur. See Brief for Respondents 24; see also Tr. of Oral Arg. 38 (“[T]he mistake that was made [by the District Court] was in not appreciating ... that the vacatur did have [the] effect” of independently prohibiting the growth and sale of almost all RRA). An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course. See, e. g., Weinberger v. Romero-Barcelo, 456 U. S. 305, 311-312 (1982). If a less drastic remedy (such as partial or complete *166 vacatur of APHIS’s deregulation decision) was sufficient to redress respondents’ injury, no recourse to the additional and extraordinary relief of an injunction was warranted. See ibid.; see also Winter, 555 U. S., at 31-33.
E
In sum, the District Court abused its discretion in enjoining APHIS from effecting a partial deregulation and in prohibiting the possibility of planting in accordance with the terms of such a deregulation. Given those errors, this Court need not express any view on whether injunctive relief of some kind was available to respondents on the record before us. Nor does the Court address the question whether the District Court was required to conduct an evidentiary hearing before entering the relief at issue here. The judgment of the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

Justice Breyer took no part in the consideration or decision of this case.

 We need not decide whether the District Court had the authority to replace the vacated agency order with an injunction of its own making. The question whether petitioners are entitled to the relief that they seek goes to the merits, not to standing.

 We do not rest “the primary basis for our jurisdiction on the premise that the District Court enjoined APHIS from partially deregulating RRA in any sense.” Post, at 172 (Stevens, J., dissenting). Even if the District Court’s order prohibiting a partial deregulation applies only to “the particular partial deregulation order proposed to the court by APHIS,” post, at 173, petitioners would still have standing to challenge that aspect of the order.

 At least one of the respondents in this case specifically alleges that he owns an alfalfa farm in a prominent seed-growing region and faces a significant risk of contamination from RRA. See Record, Doe. 62, pp. 1-2; id., ¶ 10, at 3-4 (Declaration of Phillip Geertson in Support of Plaintiffs’ *154 Motion for Summary Judgment) (“Since alfalfa is pollinated by honey, bumble and leafeutter bees, the genetic • contamination of the Roundup Ready seed will rapidly spread through the seed growing regions. Bees have a range of at least two to ten miles, and the alfalfa seed farms are much more concentrated”). Other declarations in the record provide further support for the District Court’s conclusion that the deregulation of RRA poses a significant risk of contamination to respondents’ crops. See, e. g., id., Doc. 53, ¶ 9, p. 2 (Declaration of Jim Munsch) (alleging risk of “significant contamination . . . due to the compact geographic area of the prime alfalfa seed producing areas and the fact that pollen is distributed by bees that have large natural range of activity”); App. ¶ 8, p. 401 (Declaration of Mare Asumendi) (“Roundup alfalfa seed fields are currently being planted in all the major alfalfa seed production areas with little regard to contamination to non-GMO seed production fields”).

 Petitioners focus their challenge on the part of the District Court’s order prohibiting the planting of RRA. As we explain below, however, the broad injunction against planting cannot be valid if the injunction against partial deregulation is improper. See infra, at 165; see also App. to Pet. for Cert. 64a (District Court order recognizing that APHIS’s proposed remedy “seek[s], in effect, a partial deregulation that permits the continued expansion of the [RRA] market subject to certain conditions” (emphasis added)). The validity of the injunction prohibiting partial deregulation is therefore properly before us. Like the District Court, we use the term “partial deregulation” to refer to any limited or conditional deregulation. See id,., at 64a, 69a.

 NEPA provides that an EIS must be “inelude[d] in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment.” 42 U. S. C. § 4332(2)(C) (emphasis added); see also Kleppe v. Sierra Club, 427 U. S. 390, 406 (1976) (“A court has no authority to depart from the statutory language and . . . determine a point during the germination process of a *161 potential proposal at which an impact statement should be prepared” (first emphasis added)). When a particular agency proposal exists and requires the preparation of an EIS, NEPA regulations allow the agency to take at least some action pertaining to that proposal during the pendency of the EIS process. See 40 CFR §§ 1506.1(a), (c) (2009). We do not express any view on the Government’s contention that a limited deregulation of the kind embodied in its proposed judgment would not require the prior preparation of an EIS. See Brief for Federal Respondents 21-22 (citing § 1506.1(a)); Tr. of Oral Arg. 20 (“[W]hat we were proposing for the interim, that is allowing continued planting subject to various protective measures, was fundamentally different from the action on which the EIS was being prepared”). Because APHIS has not yet invoked the procedures necessary to attempt a limited deregulation, any judicial consideration of such issues is not warranted at this time.

 The District Court itself appears to-have recognized that its broad injunction may not have been necessary to avert any injury to respondents. See App. to Pet. for Cert. 191a (“It does complicate it to try to fine-tune a particular remedy. So the simpler the remedy, the more attractive it is from the Court’s point of view, because it appears to me *164 enforcement is easier. Understanding it is easier, and it may be, while a blunt instrument, it may actually, for the short term, achieve its result, achieve its purpose, even maybe it overachieves it. . . . Maybe a lot of it is not necessary. I don’t know” (emphasis added)); see also ibid. (“I don’t say you have to be greater than 1.6 miles, you have to be away from the bees, you have to be dah dah dah. That’s the farm business. I’m not even in it”); id., at 192a (“I am not going to get into the isolation distances”).