SHEDD, Circuit Judge,
with whom Judge NIEMEYER and Judge AGEE join, dissenting[1]:
National security is a complex business with potentially grave consequences for our country. Recognizing this fact, the Supreme Court has observed that “it is obvious and unarguable that no governmental interest is more compelling than the security of the Nation.” Haig v. Agee, 453 U.S. 280, 307, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981).[2] This observation is especially true in today’s world, where we face threats from radical terrorists who seek to cross *655 our borders for the purpose of harming us and destroying our way of life. Although we often are quick to forget the fact, “the real risks, the real threats, of terrorist attacks are constant and not likely soon to abate,” Boumediene v. Bush, 553 U.S. 723, 793, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008); therefore, “the Government’s interest in combating terrorism is an urgent objective of the highest order,” Holder v. Humanitarian Law Project, 561 U.S. 1, 28, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010). Given the multitude of critical factors involved in protecting national security, including the delicacy of foreign relations and the worldwide intelligence information that is constantly generated, combined with the ever-changing threatening circumstances, “questions of national security ... do not admit of easy answers, especially not as products of the necessarily limited analysis undertaken in a single case,” Lebron v. Rumsfeld, 670 F.3d 540, 549 (4th Cir. 2012), and “they are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil,” Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948).
Every President has the “constitutional responsibility for the security of the Nation as the Chief Executive and as Commander in Chief of our Armed forces.” El-Masri v. United States, 479 F.3d 296, 304 (4th Cir. 2007). In this role, a President and his national security advisors (unlike federal judges at all levels, lawyers, and commentators) have constant access to information “that may describe new and serious threats to our Nation and its people.” Boumediene, 553 U.S. at 797, 128 S.Ct. 2229. For these reasons and more, “courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.” Dept. of Navy v. Egan, 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988).
This case involves the President’s attempt to impose a temporary pause on the entry of nationals from six countries that indisputably present national security concerns. “It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.” Harisiades v. Shaughnessy, 342 U.S. 580, 589, 72 S.Ct. 512, 96 L.Ed. 586 (1952). Along this line, the Supreme Court has noted that “the Government’s interest in preventing the entry of unwanted persons and effects is at its zenith at the international border,” United States v. Flores-Montano, 541 U.S. 149, 152, 124 S.Ct. 1582, 158 L.Ed.2d 311 (2004), and has explained that the President is not obligated to disclose his reasons “for deeming nationals of a particular country a special threat ... and even if [he] did disclose them a court would be ill equipped to determine their authenticity and utterly unable to assess their adequacy,” Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 491, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).
One thing is certain: to whatever extent it is permissible to examine the President’s national security decision in this ease, where the President has acted “pursuant to an express or implied authorization from Congress,” the President’s decision is entitled to “the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.” Dames & Moore v. Regan, 453 U.S. 654, 668, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). This is especially true when, as here, plaintiffs seek preliminary injunctive relief to *656 stop the President from executing a national security policy, for in even the most routine cases, which this certainly is not, a preliminary injunction “is a drastic and extraordinary remedy, which should not be granted as a matter of course.” Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010).
The obvious rationale underlying these important principles has been discussed many times by the Supreme Court, this Court, and others, but the district court totally failed to respect them. Rather than giving any deference to the President (or his national security advisors) regarding his national security assessment, or imposing a heavy burden on the plaintiffs to overcome the President’s decision, or showing any sense of restraint in wielding the extraordinary remedy of injunctive relief, the district court simply cast aside the President’s decision as nothing more than a sham based on its own ideas concerning the wisdom of the Executive Order. In doing so, the district court made the extraordinary finding—based on a preliminary evidentiary record—that the President exercised his otherwise lawful authority to effect the temporary pause primarily because he bears animus towards Muslims and wants to impose a “Muslim ban.” Remarkably, the district court made this finding while also acknowledging that the Executive Order is facially neutral, that there are heightened security risks with the countries listed in the Executive Order, and that national security interests would be served by the travel pause.
The shortcomings inherent in the district court’s fact-finding are obvious. It is primarily based on the district court’s selectively negative interpretation of political campaign statements made before the President swore his oath of office,[3] its acceptance of the national security assessment of former government officials (many of whom openly oppose this President), its failure to account for the national security assessment of the current Attorney General and Secretary of Homeland Security, its misplaced conclusion regarding the President’s decision not to submit the Executive Order to the Executive bureaucracy for “inter-agency review,” and the purported novelty of the temporary travel pause. Moreover, despite its express recognition of the dangers posed by the designated countries and the national security interests served by the temporary travel pause, the district court—with no access to intelligence information[4]—criticized the President for failing to identify any instances of *657 individuals who came from the designated countries having engaged in terrorist activity in the United States, faulted the President for not explaining why the temporary travel pause is the necessary response to the existing risks, and ultimately found that the President failed to prove that national security cannot be maintained without the temporary travel pause. As if all of this is not enough, the President’s supposed goal of “banning Muslims” from the United States is not remotely served by the temporary travel pause, a fact that makes the district court’s factual finding even more dubious.[5]
The district court’s questionable fact-finding is sufficient (among other reasons) to vacate the injunction, but there is ultimately a more obvious fatal flaw in the injunction order: the court’s complete failure to actually account for the public interest. In addition to the general restraint courts must show when considering injunctive relief, courts “should be particularly cautious when contemplating relief that implicates public interests.” Salazar v. Buono, 559 U.S. 700, 714, 130 S.Ct. 1803, 176 L.Ed.2d 634 (2010).[6] Although the public interest generally favors the protection of constitutional rights, that interest must sometimes yield to the public interest in national security, see, e.g., Defense Distrib. v. U.S. Dept. of State, 838 F.3d 451, 458-60 (5th Cir. 2016), because “unless a society has the capability and will to defend itself from the aggressions of others, constitutional protections of any sort have little meaning,” Wayte v. United States, 470 U.S. 598, 612, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). This is such a case.
The circumstances of this case are similar in material respects to those presented in Winter, and a straightforward application of that case warrants reversal here. The Winter plaintiffs complained that the United States Navy’s sonar-training program harmed marine mammals and that the Navy should have prepared an environmental impact statement before conducting certain training exercises. The district court agreed and preliminarily enjoined the Navy from using sonar in certain circumstances during training exercises. The Ninth Circuit affirmed the injunction, but the Court reversed. Applying the standard four-part preliminary injunction test, the Court acknowledged the importance of plaintiffs ecological, scientific, and recreational interests in marine mammals and accepted for purposes of discussion that they had shown irreparable injury from the Navy’s training exercises. However, the Court concluded that these factors were “outweighed by the public interest and the Navy’s interest in effective, realistic training of its sailors.” Id. at 23, 129 5.Ct. 365. In the Court’s view: “A proper consideration of these factors alone require^] denial of the requested injunctive relief.” Id.
The Court explained that the lower courts “significantly understated the burden the preliminary injunction would im *658 pose on the Navy’s ability to conduct realistic training exercises, and the injunction’s consequent adverse impact on the public interest in national defense.” Id. at 24, 129 S.Ct. 365. In reaching this conclusion, the Court noted that the case involved complex professional military decisions regarding training and control of a military force, to which “great deference” is ordinarily given, id., and it observed that the record contained declarations from senior Navy officials that underscored the threat posed by enemy submarines and the need for extensive sonar training to counter the threat, as well as a declaration from the President that training with sonar was essential to national security. The Court emphasized that the lower courts “failed properly to defer” to senior Navy officers’ judgment about the effect that a preliminary injunction would have on the effectiveness of the training. Id. at 27, 129 S.Ct. 365. Additionally, the Court pointed out that “despite the importance of assessing the balance of equities and the public interest in determining whether to grant a preliminary injunction, the District Court addressed these considerations in only a cursory fashion.” Id. at 26, 129 S.Ct. 365. Ultimately, while acknowledging that “military interests do not always trump other considerations,” the Court determined that “the proper determination of where the public interest lies does not strike us as a close question.” Id.
As in Winter, the district court’s public interest analysis misses the mark. Here, the facially neutral Executive Order explains in detail the President’s underlying reasoning for the temporary travel pause. Additionally, • the record contains a joint letter from the Attorney General and Secretary of Homeland Security in which they detail their concerns “about weaknesses in our immigration system that pose a risk to our Nation’s security,” and in which they assert that “it is imperative that we have a temporary pause on the entry of nationals from certain countries to allow this review to take place—a temporary pause that will immediately diminish the risk we face from application of our current vetting and screening programs for individuals seeking entry to the United States from these countries.” To be sure, the district court found that the President’s alleged bias is the primary reason for the temporary travel pause, but it found no such bias on the part of his Cabinet officials.[7] Moreover, the district court acknowledged that national security is in fact a secondary reason for the temporary travel pause, and it found that the countries designated in the Executive Order present heightened security risks and that national security interests would be served by the temporary travel pause.
Despite this record, the district court— with no meaningful analysis—simply dismissed the public’s interest in national security with the specious conclusion that “Defendants ... have not shown, or even asserted, that national security cannot be maintained without an unprecedented six-country travel ban, a measure that has not been deemed necessary at any other time in recent history.” I.R.A.P. v. Trump, — F.Supp.3d —, —, 2017 WL 1018235, *17 (D. Md. 2017). As noted, national security is the most compelling of public interests, and the question of how best to protect public safety in this area does not, as the district court implies, boil down to a least-restrictive means test, Padilla v. *659 Hanft, 423 F.3d 386, 395 (4th Cir. 2005) (“We believe that the district court ultimately accorded insufficient deference to that determination, effectively imposing upon the President the equivalent of a least-restrictive-means test. To subject to such exacting scrutiny the President’s determination that criminal prosecution would not adequately protect the Nation’s security at a very minimum fails to accord the President the deference that is his when he acts pursuant to a broad delegation of authority from Congress.”), or require a danger that satisfies the court’s “independent foreign policy analysis,” Regan v. Wald, 468 U.S. 222, 242, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984). Therefore, the relevant point is not whether the temporary travel pause is the only, way, or even the best way, to protect national security. The simple fact of the matter is that regardless of any ulterior motive one might ascribe to the President, the record still conclusively establishes that the temporary travel pause will in fact promote an important national security objective.
Undoubtedly, protection of constitutional rights is important, but there are often times in the federal system when constitutional rights must yield for the public interest. As we have explained, for example, in applying the state secrets doctrine, a plaintiff with a plausibly viable constitutional claim can be barred from pursuing it “not through any fault of his own, but because his personal interest in pursuing his civil claim is subordinated to the collective interest in national security.” El-Masri, 479 F.3d at 313. In my view, the very serious national security interest served by the temporary travel pause (as determined by those who are duly empowered to make the decision and who have access to current intelligence information) greatly outweighs the alleged temporary and relatively minor harm that will befall these few plaintiffs. The district court abused its discretion by failing to strike this balance. See, e.g., Sarsour v. Trump, — F.Supp.3d —, —, 2017 WL 1113305, *15 (E.D.Va. 2017) (“Based on the record now before the Court, the parties’ respective interests described above, the subject matter of EO-2, and the protections to the public that EO-2 is intended to provide, Plaintiffs have not established that the public interest favors issuance of immediate relief in this action.”). B
Today’s decision may be celebrated by some as a victory for individual civil rights and justice, and by others as a political defeat for this President. Yet, it is shortsighted to ignore the larger ramifications of this decision. Regrettably, at the end of the day, the real losers in this case are the millions of individual Americans whose security is threatened on a daily basis by those who seek to do us harm. Even if the district court’s instinct is correct and no tangible harm directly results from its order enjoining the President from attempting to protect American citizens, the injunction prohibits the government from addressing a serious risk identified by the Attorney General and Homeland Security Secretary; therefore, the security of our nation is indisputably lessened as a result of the injunction. Moreover, the President and his national security advisors (and perhaps future Presidents) will be seriously hampered in their ability to exercise their constitutional duty to protect this country.[8]

. I have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

.Ironically, courts are sensitive in defending their own integrity and often use the judicial oath of office as a shield against claims of bias. See generally Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 891, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009) (Roberts, C.J., dissenting) ("There is a presumption of honesty and integrity in those serving as adjudicators. All judges take an oath to uphold the Constitution and apply the law impartially, and we trust that they will live up to this promise."). Certainly, the President, who takes a similar oath of office, should be accorded the same trust. See, e.g., N.L.R.B. v. Enterprise Leas. Co. SE, LLC, 722 F.3d 609, 671 (4th Cir. 2013) (Diaz, J., concurring in part and dissenting in part) ("The majority also gives short shrift to the fact that the President too swears an oath to uphold the Constitution, and that when he acts under its express authority, his actions should be accorded a presumption of constitutionality.”).

. In Waterman S.S. Corp., 333 U.S. at 111, 68 S.Ct. 431, the Court made the following apt observation: "The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports neither are nor ought to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret.”

. The limited temporal and geographical scope of the Executive Order, coupled with the designated categorical exclusions and case-by-case waiver process, strongly supports the President’s stated national security rationale rather than the district court’s bias-finding. Even without those exclusions and waivers, the temporary travel pause would only potentially affect approximately 10% of Muslims worldwide.

. To obtain a preliminary injunction, a plaintiff must establish: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. Winter v. Natural Res. Def. Counc., Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

. Similarly, plaintiffs’ counsel admitted during oral argument that he has no basis to challenge the integrity of the Attorney General and Secretary of Homeland Security. The apparent good-faith of these officials, which is an inconvenient fact for the plaintiffs, leads inexorably to the unanswered question of why the district court essentially ignored or rejected their detailed national security advice to the President.

. At oral argument, several judges (including myself) questioned when, if ever, the President could free himself from the stigma of bias that the district court has enshrined by its preliminary "factfinding.” Notably, no one has provided a satisfactory response.