# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 10, 2006                  Decided July 18, 2006

No. 02-1367

CONSTELLATION ENERGY COMMODITIES GROUP, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CALIFORNIA POWER EXCHANGE CORPORATION, ET AL.,
INTERVENORS

———

Consolidated with
03-1285, 05-1094, 05-1154

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*David C. Frederick* argued the cause for petitioners
Constellation Energy Commodities Group, Inc., Powerex Corp.,
and supporting intervenors. With him on the briefs were *Scott
H. Angstreich, Paul W. Fox, Andrea M. Kearney, Ronald N.
Carroll, John T. Stough, Jr., Kevin M. Downey, Charles V.
Garcia, James C. Beh, Jeffrey M. Jakubiak, Robert C.
McDiarmid, Daniel I. Davidson*, and *Lisa G. Dowden.*

*Richard L. Roberts* argued the cause for petitioner Southern California Edison Company and intervenor Pacific Gas and Electric Company. With him on the briefs were *Catherine M. Giovannoni*, *Melanie J. Teplinsky*, *Stephen E. Pickett*, *Michael D. Mackness, Julie A. Miller, Mark D. Patrizio, Joseph H. Fagan,* and *Stan Berman. Paul B. Mohler* entered an appearance.

*Lona T. Perry*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *John S. Moot*, General Counsel, and *Robert H. Solomon*, Solicitor.

*David C. Frederick, Scott H. Angstreich, Paul W. Fox, Andrea M. Kearney*, and *Ronald N. Carroll* were on the brief for intervenors in support of respondent.

*Richard L. Roberts, Catherine M. Giovannoni, Melanie J. Teplinsky, Stephen E. Pickett, Michael D. Mackness, Julie A. Miller, Erik N. Saltmarsh, Mary F. McKenzie, Traci Bone, Mark D. Patrizio, Joseph H. Fagan*, and *Stan Berman* were on the brief for intervenors California Electricity Oversight Board, et al. in support of respondent. *Arocles Aguilar, Sean H. Gallagher,* and *Victoria S. Kolakowski* entered appearances.

Before: GINSBURG, *Chief Judge*, and TATEL and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: The bankruptcy of the California Power Exchange Corporation (the CalPX or the PX) in March 2001 gave rise to several proceedings before the Federal Energy Regulatory Commission and to the orders before us today. Petitioners Constellation Energy Commodities Group, Inc. and

Powerex Corporation ("the sellers")[*] argue the Commission misinterpreted the CalPX tariff to allow the PX to retain collateral they had posted with it, and Powerex individually challenges the Commission's decision allowing the PX to retain its so-called "chargeback" payments. Petitioner Southern California Edison Company and intervenor Pacific Gas and Electric Company ("the purchasers") claim the Commission has not allowed the PX to retain sufficient collateral. Because we conclude the Commission acted reasonably in all respects, we deny the petitions for review.

## I. Background

We pick up the "long, detailed, and tortured" history of the California energy crisis in the mid-1990s when, in an attempt to deregulate its energy markets, the State of California created the CalPX and the California Independent System Operator Corporation (CAISO). *Bonneville Power Admin. v. FERC*, 422 F.3d 908, 911 (9th Cir. 2005). The CAISO is responsible for managing the flow of electricity on the electric grid across the State and runs a "spot" market for electricity. The now-defunct CalPX ran an auction market for electricity in which participants bought and sold power in "day-ahead" and "day-of" markets subject to the conditions of the CalPX tariff. In particular, the CalPx tariff required each participant to maintain with the PX collateral sufficient to cover its outstanding liabilities from the time "the liabilities are incurred" until "payment is billed and settled." CalPX Tariff § 2.2.

Beginning in the summer of 2000 many purchasers' liabilities skyrocketed due to the increased rates they paid for

---

[*]Although the parties could both buy and sell power in the CalPX markets, we use the terms "sellers" and "purchasers" to describe the petitioners' roles relevant to this case.

power. *Bonneville*, 422 F.3d at 912. San Diego Gas and Electric Company, a purchaser in the CalPX market, filed a complaint with the Commission alleging these rates were unjust and unreasonable, in violation of 16 U.S.C. § 824d(a). *See San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Servs. into Markets Operated by the [CAISO] & the [CalPX]*, 93 F.E.R.C. ¶ 61,294, at 61,983 (2000). The Commission investigated, agreed, and "condition[ed] continued approval of market-based rates on the seller agreeing to refund" any amount it had charged in excess of the maximum just and reasonable rate from October 2, 2000 to June 20, 2001 (the refund period).[*] *Id.* at 61,999, 62,010-11; *Powerex Corp. v. Cal. Power Exch. Corp.*, 102 F.E.R.C. ¶ 61,328, at 62,121 (2003) (*Powerex Order*).

Edison and PG&E were unable, however, under state law, to pass on to their retail customers the increased rates they had paid for power purchased through the PX. As a result, the two companies together defaulted on more than a billion dollars of debt to the PX and others. *Pac. Gas & Elec. Co. v. Cal. Power Exch. Co.*, 95 F.E.R.C. ¶ 61,020, at 61,041 (2001) (*2001 Chargeback Order*). The CalPX then sought to recover the unpaid amounts under the "chargeback" provision of its tariff, "an allocation mechanism intended to allow the PX to recover the uncollected receivables of a defaulting PX debtor" from the other, non-defaulting participants. *Powerex Order*, 102 F.E.R.C. at 62,120 n.3.

---

[*]The refund period began 60 days after the rates were first challenged as unjust and unreasonable and ended when the Commission began "constraining prices" in the power markets. *See San Diego Gas & Elec. Co. v. Sellers of Energy and Ancillary Serv. into Markets Operated by the [CAISO] & the [CalPX]*, 96 F.E.R.C. ¶ 61,120, at 61,502, 61,504 (2001).

5

Several participants balked at the demand made by the CalPX and turned to the Commission for relief. In April 2001, the Commission concluded that charging other participants in order to satisfy PG&E's and Edison's debts would "cause virtually all PX participants to default." *2001 Chargeback Order*, 95 F.E.R.C. at 61,045. The Commission therefore directed the PX to: "(1) rescind all chargeback actions related to PG&E's and SoCal Edison's liabilities; and (2) refrain from taking any future chargeback action related to" those liabilities until the Commission had ruled on other complaints related to the bankruptcy. *Id.* at 61,046.

Meanwhile, in March 2001, the CalPX had filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, and the following month suspended operations in its markets. *Constellation Power Source, Inc. v. Cal. Power Exch. Corp.*, 100 F.E.R.C. ¶ 61,124, at 61,482 (2002) (*Constellation Order*). In 2002 Constellation filed a complaint with the Commission seeking release of the collateral it had posted with the CalPX pursuant to § 2.2 of the CalPX tariff. Constellation maintained its liabilities to the PX had been "billed and settled" -- the precondition in § 2.2 for the release of collateral -- when it paid its last invoice for debts incurred in the markets that closed in 2001. Allowing the PX to keep the collateral, Constellation argued, would convert the collateral "into a guaranty of payment" for any liability the Commission might assign Constellation as a result of the refund proceedings, thus contravening both the "CalPX's tariff and the Commission policy" against requiring guaranties for refunds. *Id.*

The Commission denied Constellation's complaint, holding that, "given the numerous ongoing contested proceedings regarding the transactions that occurred in the PX markets," the "final billing and settlement" of Constellation's liabilities had

"not yet taken place." *Id.* at 61,486.  The agency reasoned:

> [We are] ... faced with circumstances that were not contemplated when the Commission approved the 'billed and settled' provision of the CalPX tariff.  The CalPX is no longer operating and therefore cannot adjust future bills when outstanding liabilities are finally determined ....
>
> Under these unusual circumstances, the Commission finds that retaining the collateral is in the public interest because [the Commission is] enforcing the terms of the tariff to assure that all market participants meet their outstanding obligations and the ultimate CalPX creditors are paid.

*Id.*

Constellation petitioned for rehearing, reiterating the arguments raised in its complaint and pointing out the Commission had not addressed its alternative proposal that the PX release all but the amount of collateral necessary to cover the refunds still pending.  *See Constellation Power Source, Inc. v. Cal. Power Exch. Corp.*, 100 F.E.R.C. ¶ 61,380, at 62,697 (2002) (*Constellation Rehearing Order*).  The Commission accepted Constellation's alternative proposal and ordered the CalPX to release all but $10 million of Constellation's collateral -- a "conservative estimate" of the amount needed "to cover [Constellation's] potential refund liability." *Id.*

Edison and PG&E then each petitioned for further rehearing.  Both argued that, because the CalPX's accounts were "subject to many ongoing controversies," $10 million might not cover the refunds for which Constellation ultimately could be found liable. *Constellation Power Source, Inc. v. Cal. Power*

*Exch. Corp.*, 111 F.E.R.C. ¶ 61,147, at 61,778 (2005) (*Constellation Second Rehearing Order*). The Commission rejected their petitions, explaining that it had "t[aken] into account the fact that potential refunds may increase" and "used the most conservative estimates" before determining that $10 million would be sufficient. *Id.* at 61,778-79.

Powerex also joined the fray, filing a complaint with the Commission seeking from the CalPX (1) the release of its collateral, and (2) the return of the chargeback payments it had made when PG&E and Edison defaulted. *Powerex Order*, 102 F.E.R.C. at 62,121. In March 2003 the Commission concluded, as it had in the *Constellation Order*, that Powerex's liabilities were not yet "billed and settled" because the refund proceedings were not complete. *Id.* at 62,124. In contrast to its decision in the *Constellation Rehearing Order*, however, the Commission refused to order the CalPX to release any of Powerex's collateral because it could not determine "whether Powerex's collateral exceeds its potential refund liability." *Id.* at 62,123.

As for the chargeback payments, the Commission deferred consideration of Powerex's request pending resolution of the petitions for rehearing of the *2001 Chargeback Order*. *See id.* at 62,124. In October 2004 it determined the return of all chargeback funds "should wait until a final computation" in the refund proceedings: "In the event that there is a shortfall of payments due from sellers, the shortfall may need to be allocated such that a seller with chargebacks that are being held by the PX[] may not be entitled to the entire amount previously paid." *Pac. Gas & Elec. Co. v. Cal. Power Exch. Corp.*, 109 F.E.R.C. ¶ 61,027, at 61,114 (*2004 Chargeback Order*). The Commission explained that, although some participants had paid their chargebacks in cash, others had "paid" by accepting reduced payments of monies due from the CalPX; the latter group could not be "reimbursed" until the PX's accounts were

settled. Only by waiting until the refund proceedings were complete, therefore, could the Commission ensure the two groups "w[ould] be treated similarly." *Id.* at 61,114 n.30.

Powerex petitioned for rehearing. The Commission rejected its claims but clarified that the chargeback funds would be retained "only until the individual PX account of the PX participant that made a chargeback payment is resolved in the Refund Proceedings"; "the chargeback funds held by the PX are not to be used to make up any general shortfall" caused by another participant's default. *Coral Power, L.L.C. v. Cal. Power Exch.*, 110 F.E.R.C. ¶ 61,288, at 62,108 (2005) (*2005 Chargeback Order*). Constellation, Powerex, and Edison each petition for review of one or more of the Commission's orders.

## II. Analysis

Both sellers argue the Commission's interpretation of the CalPX tariff is unreasonable and contrary to precedent; Powerex also challenges the Commission's orders denying the release of its chargeback funds. As intervenors in the case brought by Edison, the sellers challenge Edison's standing and defend the Commission's release of Constellation's collateral.

The purchasers argue the Commission's decision releasing all but $10 million of Constellation's collateral (1) conflicts with the CalPX tariff, (2) is not supported by substantial evidence, and (3) conflicts with Commission precedent. As intervenors in the case brought by the sellers, the purchasers argue the sellers lack standing and their petitions are moot; the purchasers also support on their merits the Commission's decisions allowing the PX to retain the sellers' collateral and Powerex's chargeback funds.

The Commission maintains several arguments raised by the

sellers are jurisdictionally barred because they were not raised before the agency. In the alternative, the Commission defends its orders on their merits.

As always, we will set aside a decision of the Commission only if it is arbitrary and capricious or otherwise contrary to law. *Envtl. Action, Inc. v. FERC*, 939 F.2d 1057, 1061 (D.C. Cir. 1991). Because we conclude the Commission rationally interpreted and implemented the CalPX tariff, we do not disturb the orders under review.

A. Justiciability

As stated, Edison and the sellers challenge each other's standing to petition for review. The facts relevant to standing, however, are not in dispute; rather, each side impugns the legal significance of the facts marshaled by the other in support of its standing.

First, Edison and PG&E claim that, because the Commission approved the sellers' requests to offset against their eventual refund obligations the costs they incur to keep their collateral posted with the PX, the sellers' petitions are moot and they lack the injury in fact necessary to support their standing, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The sellers reply that the "posting costs are not the only source of ... injury from the [PX's] retention of their collateral"; because "credit pledged in one market cannot be utilized productively in other markets," their business opportunities are limited.

Our caselaw makes clear the sellers' claims are justiciable: A "present injurious effect on [a petitioner's] business decisions," *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 540 (D.C. Cir. 1999), is a cognizable injury in fact and presents

a live controversy within the "case or controversy" limitation of Article III of the Constitution of the United States. *See Fund for Animals, Inc. v. Hogan*, 428 F.3d 1059, 1065 (D.C. Cir. 2005).

For their part, the sellers argue Edison lacks standing because its alleged injury -- the release of Constellation's collateral will "make it more difficult ... to recover refunds from Constellation" -- is speculative and not imminent. *See Defenders of Wildlife*, 504 U.S. at 560 (requiring that injury be "actual or imminent, not 'conjectural' or 'hypothetical'"). Edison responds with decisions from two sister circuits holding the loss of an interest in collateral constitutes an immediate injury in fact. *See In re Paxton*, 440 F.3d 233, 236 (5th Cir. 2006); *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 55 (2d Cir. 2004).

We agree with Edison that the increased risk of non-recovery inherent in the reduction of collateral securing a debt of uncertain amount is sufficient to support its standing. As detailed below, Constellation's ultimate liability to the PX has not been settled, and Edison claims that, without access to the released collateral, it lacks the security of repayment guaranteed to participants by § 2.2 of the CalPX tariff. *Cf. Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 682 (7th Cir. 1992) (victim of "insured's tort" has "legally protectable interest" in tortfeasor's policy even before he has obtained judgment upon claim). In these circumstances, and considering Edison's legitimate interest in obtaining redress for any unjust or unreasonable rates it paid, we conclude its claimed interest in the collateral satisfies the standing requirements of Article III.

B. The Sellers' Petitions

Section 2.2 of the CalPx tariff, the proper interpretation of which is in dispute, provides in relevant part:

> Each PX Participant shall maintain sufficient collateral to cover its aggregate outstanding liabilities in the Day-Ahead and Day-Of Markets to and from the PX between cash clearing cycles or during the period in which the liabilities are incurred and when payment is billed and settled.

CalPX Tariff § 2.2. Our review of the Commission's interpretation of a filed tariff is analogous to our review of the agency's interpretation of a statute it administers. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842-43 (1984). First, we determine whether the tariff is ambiguous; if it is not, then the Commission must adhere to its plain meaning. *FPL Energy Marcus Hook, L.P. v. FERC*, 430 F.3d 441, 446 (D.C. Cir. 2005). If the tariff is ambiguous, however, then we defer to the Commission's interpretation so long as it is reasonable, regardless whether it seems to us the best interpretation. *Williams Natural Gas Co. v. FERC*, 3 F.3d 1544, 1551 (D.C. Cir. 1993).

1. The plain meaning of the tariff

The sellers first argue "the plain meaning and structure of the CalPX tariff unambiguously establish" that the "liabilities" for which the PX could require collateral per § 2.2 have already been "billed and settled." In support of this argument, the sellers cite various other provisions of the tariff that, they claim, by putting it in context show the plain meaning of § 2.2. The Commission, in response, maintains the sellers' argument is not properly before the court because in arguing before the Commission they "never cited ... any other provisions of the PX tariff now cited in their brief." *See* 16 U.S.C. § 825*l*(b) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is

reasonable ground for failure so to do").

The Commission is correct. The sellers did not make this argument before the agency and in fact never even cited the sections of the tariff upon which they now rely for the interpretation of § 2.2. Accordingly, we have before us no cognizable argument that "the period in which ... payment is billed and settled" plainly does not remain open until the Commission determines the sellers' liability for refunds.

2. A reasonable interpretation

The sellers next argue the Commission's interpretation of the tariff "cannot be sustained because it is unreasonable." Specifically, they claim the Commission's conclusion that their accounts will not be "billed and settled" until the pending refund proceedings are complete conflicts with "settled ... precedent" in which the Commission has refused, absent "extraordinary circumstances," to require a party to provide a guaranty for potential refund obligations. *See, e.g.*, *Distrigas of Mass. Corp.*, 33 F.E.R.C. ¶ 61,406, at 61,776 (1985).

The Commission, defending its interpretation as consistent with precedent, notes that in *Distrigas* and similar cases it "denied requests for bond or escrow requirements to secure refund obligations for rates that had been set for hearing." Here, in contrast, it did "not requir[e] a guaranty for the payment of refunds, but rather enforc[ed] the terms of the PX tariff regarding retention of collateral." As the Commission explained in the order under review, even after the CalPX closed its markets it continued to issue new invoices to reflect adjustments to and revisions of transactions dating as far back as August 2000, and "[t]he amount of Constellation's outstanding liability [to the CalPX was] not yet known." *Constellation Order*, 100 F.E.R.C. at 61,486.

We think the Commission's position that the sellers' liabilities have not yet been "billed and settled" is both reasonable and consistent with precedent: Certainly decisions such as *Distrigas* in no way precluded the parties from entering into an agreement -- more properly from maintaining and accepting a tariff -- that provides billing and settlement would not take place, and consequently collateral would be required, until any refund proceedings were complete.

Indeed, we believe the Commission reasonably concluded the parties did just that, with the result that the sellers' liabilities for transactions during the refund period will not be "settled" until the Commission determines the maximum just and reasonable price at which they could lawfully sell power during the refund period. Furthermore, the Commission's interpretation, which will help ensure "market participants meet their outstanding obligations and the ultimate CalPX creditors are paid," *id.*, is consistent with both the text of § 2.2, which nowhere limits which liabilities must be collateralized, and the general purpose of the provision requiring that market transactions be secured. In sum, we believe the Commission reasonably concluded the sellers' total liabilities to the CalPX had not yet been "billed and settled"; consequently it did not err in permitting the PX to retain the sellers' collateral. *See Williams Natural Gas Co.*, 3 F.3d at 1551.

3. The CAISO market

The sellers next argue the Commission, when it refused to direct the PX to release their collateral, "violated the CalPX tariff" by considering transactions in the CAISO market with respect to which the sellers did not use the PX as their scheduling coordinator. As the sellers note, § 2.2 of the tariff requires collateral solely for obligations incurred "to and from the PX," and the only way in which a seller in the CAISO

market could incur an obligation "to ... the PX" was to use the CalPX as its scheduling coordinator.

The Commission maintains we may not consider this argument because the sellers failed to raise it before the agency. Constellation, however, claims it did raise the issue in the petition for rehearing where it argued for limited liability "[e]ven if its potential refunds to the ISO are considered (as they should not be)." Powerex similarly points to a footnote in its petition for rehearing, in which it asserted that "collateral held by the CalPX never was intended ... to operate as security for participation in markets outside of the CalPX, such as markets operated by the CAISO."

Each quoted passage states a conclusion; neither makes an argument. Parties are required to present their arguments to the Commission in such a way that the Commission knows "specifically ... the ground on which rehearing [i]s being sought." *Intermountain Mun. Gas Agency v. FERC*, 326 F.3d 1281, 1285 (D.C. Cir. 2003). Although each seller mentioned the CAISO, neither claimed, either as a matter of fact or of law, that it had not incurred liability to the PX with respect to any transaction in the CAISO market. Absent such a claim, the Commission had no reason to disregard the sellers' transactions in the CAISO market, and we cannot entertain the sellers' belated argument to the contrary. *See* 16 U.S.C. § 825*l*(b).

4. Chargeback

Finally, Powerex contends the Commission "violated the CalPX tariff" by allowing the PX to retain the chargeback payments Powerex made after PG&E and Edison defaulted. Powerex claims the tariff authorized a chargeback only to cover the present default of another participant, whereas the Commission is attempting to provide, by allowing the PX to

retain the chargeback payments until the refund proceedings are complete, security against the possibility a participant might default in the future. The Commission explained its decision was necessary to "assure that those who paid their chargeback through receiving a reduced payment from the PX will be treated similarly to those who paid the chargeback in cash[;] both will receive a similar allocation of any shortfall," *Chargeback 2004 Order*, 109 F.E.R.C. at 61,114 n.30, and neither will be reimbursed until refund proceedings are complete.

Powerex urges us to reject the Commission's invocation of the need for equity among market participants, claiming the Commission did not rely consistently upon that ground in its orders. In particular, Powerex points to the Commission's claim in the *2005 Chargeback Order* that the chargeback funds held by the PX "may be retained only until the individual PX account of the PX participant that made a chargeback payment is resolved in the Refund Proceedings." 110 F.E.R.C. at 62,108.

It is well settled that "we defer to [the Commission's] decisions in remedial matters" and reject the Commission's choice of an equitable remedy only if it lacks a "rational basis." *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 816 (D.C. Cir. 1998). The orders in this case are not lacking. As the Commission recognized in the *2004 Chargeback Order*, those participants that "paid" the chargeback by accepting reduced payments from the CalPX cannot be reimbursed until the final CalPX accounting is complete and it is clear there are no shortfalls in the CalPX accounts to prevent full repayment. The Commission rationally concluded those participants that paid their chargebacks in cash should be treated in a like manner, receiving reimbursement only after the Commission determines there is no shortfall in their individual accounts. *See Chargeback 2004 Order*, 109 F.E.R.C. at 61,114 & n.30.

Nor, contrary to Powerex's argument, is there any inconsistency between the *2004* and *2005 Chargeback Orders*. Although one could read the footnote in the *2004 Chargeback Order* (quoted above) to allow the CalPX to use one participant's chargeback funds to offset a shortfall caused by another, that is by no means the only reasonable interpretation. As the Commission suggests, the more natural reading is that the *2004 Chargeback Order* simply delays reimbursement until each participant's account is settled and the extent of each participant's shortfall, if any, has been determined, thereby treating similarly those participants that paid in cash and those that paid by receiving reduced amounts from the PX. So understood, the *2005 Chargeback Order* clarifies, but does not contradict, the *2004 Chargeback Order*. Because the orders consistently offer a "rational basis" for delaying reimbursement of the chargeback payments, *Koch Gateway Pipeline Co.*, 136 F.3d at 816, we will not disturb the orders under review.

C. The Purchasers' Challenges

The purchasers launch several attacks on the Commission's decision to release a portion of Constellation's collateral. *Constellation Second Rehearing Order*, 111 F.E.R.C. at 61,778-79. First, they claim it conflicts with "every other case on point," citing *La Paloma Generating Co., LLC v. California Independent System Operator Corp.*, 110 F.E.R.C. ¶ 61,386 (2005) (*La Paloma Order*); *Powerex Order*, 102 F.E.R.C. ¶ 61,328; and *PG&E Energy Trading-Power, L.P. v. California Power Exchange Corp.*, 102 F.E.R.C. ¶ 61,091 (2003) (*PGET Order*). Next, they argue the decision is not supported by substantial evidence because: The Commission (1) cited no record evidence, study, or calculation showing $10 million was a "conservative estimate"; (2) without explanation, did not use the mechanism in the CalPX tariff for calculating the amount of collateral needed; and (3) disregarded evidence Edison

presented demonstrating Constellation's refund liabilities were "likely to increase substantially due to ongoing litigation." Finally, the purchasers maintain the Commission erred in relying upon the estimated refund figures provided by Constellation without itself testing them.

The Commission defends its order as consistent with precedent and supported by substantial evidence. To begin, the Commission contends the allegedly contrary decisions cited by the purchasers are not inconsistent with the orders challenged here; in those decisions the Commission refused to release collateral expressly because it was unable to determine whether the collateral would exceed the sellers' potential refund liabilities -- a determination it was able to make in Constellation's case, as explained below. Next, the Commission claims it provided "ample justification" for allowing the PX to retain only $10 million of collateral. As it explained in the *Constellation Second Rehearing Order*, that figure was based upon "the most conservative estimates" of Constellation's refund liability, taking "into account the fact that potential refunds may increase as a result of the proposed changes to the refund methodology." 111 F.E.R.C. at 61,779. Finally, the Commission maintains it properly applied the tariff: Section 2.2 required collateral to cover outstanding liabilities, and Constellation's only outstanding liabilities were such refunds as may be due the CalPX. Because the Commission conservatively estimated those refunds to be less than $10 million, it argues, it was consistent with the tariff to release the rest.

We do not believe the Commission erred. The allegedly contrary decisions are, as the Commission has explained, fully consistent with the orders in Constellation's case. In the other decisions the Commission either (1) was unable to calculate the seller's refund liability because the seller was subject to further discovery regarding market manipulation, or (2) found the

seller's estimated refund liability exceeded the amount of its posted collateral. *See Powerex Order*, 102 F.E.R.C. at 62,123 (refund liability uncertain because Powerex still subject to market manipulation proceedings); *PGET Order*, 102 F.E.R.C. at 61,250-51 (company's potential refund liability "substantially exceeds the amount of its collateral"); *La Paloma Order*, 110 F.E.R.C. at 62,497 (refund liability not finally determined).

Moreover, as we have long recognized, "it is within the scope of the agency's expertise to make ... a prediction about the market it regulates, and a reasonable prediction deserves our deference notwithstanding that there might also be another reasonable view." *Envtl. Action*, 939 F.2d at 1064. In this case, the Commission explained that its decision to release a portion of Constellation's collateral was made after considering Constellation's potential refund liability under a variety of scenarios, none of which suggested Constellation would owe more than $4.6 million to the CalPX and the CAISO together. *Constellation Second Rehearing Order*, 111 F.E.R.C. at 61,778-79 & n.12. For a margin of safety, the Commission reasonably required the CalPX to retain collateral worth more than double its highest estimate of Constellation's liability, thereby leaving room for the increase in refund liability the purchasers are predicting. In any event, the purchasers point to nothing in the record suggesting the figures provided by Constellation were erroneous or the refund required is likely to exceed $10 million. In these circumstances we have no reason to doubt the Commission's considered calculation is reasonable and deserves our deference.

## III. Conclusion

As the numerous orders before us attest, the Commission was called upon to resolve a number of complex and contested issues in the aftermath of the CalPX bankruptcy. The petitioners

have not demonstrated that it acted unreasonably in doing so. For the reasons stated, therefore, the petitions for review are

*Denied.*