Justice Breyer,
with whom Justice Ginsburg, Justice Sotomayor, and Justice Kagan join, dissenting.
The plaintiffs’ standing depends upon the likelihood that the Government, acting under the authority of 50 U. S. C. § 1881a (2006 ed., Supp. V), will harm them by intercepting at least some of their private, foreign, telephone, or e-mail conversations. In my view, this harm is not “speculative.” Indeed it is as likely to take place as are most future events that commonsense inference and ordinary knowledge of human nature tell us will happen. This Court has often found the occurrence of similar future events sufficiently cer *423 tain to support standing. I dissent from the Court’s contrary conclusion.
I
Article III specifies that the “judicial Power” of the United States extends only to actual “Cases” and “Controversies.” § 2. It thereby helps to ensure that the legal questions presented to the federal courts will not take the form of abstract intellectual problems resolved in the “rarified atmosphere of a debating society” but instead those questions will be presented “in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action.” Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U. S. 464, 472 (1982) (purpose of Article III); Lujan v. Defenders of Wildlife, 504 U. S. 555, 560 (1992) (similar); Babbitt v. Farm Workers, 442 U. S. 289, 297 (1979) (similar).
The Court has recognized that the precise boundaries of the “case or controversy” requirement are matters of “degree ... not discernible by any precise test.” Ibid. At the same time, the Court has developed a subsidiary set of legal rules that help to determine when the Constitution’s requirement is met. See Lujan, 504 U. S., at 560-561; id., at 583 (Stevens, J., concurring in judgment). Thus, a plaintiff must have “standing” to bring a legal claim. And a plaintiff has that standing, the Court has said, only if the action or omission that the plaintiff challenges has caused, or will cause, the plaintiff to suffer an injury that is “concrete and particularized,” “actual or imminent,” and “redressfcble] by a favorable decision.” Id., at 560-561 (internal quotation marks omitted).
No one here denies that the Government’s interception of a private telephone or e-mail conversation amounts to an injury that is “concrete and particularized.” Moreover, the plaintiffs, respondents here, seek as relief a judgment declaring unconstitutional (and enjoining enforcement of) a statutory provision authorizing those interceptions; and, such a *424 judgment would redress the injury by preventing it. Thus, the basic question is whether the injury, i. e., the interception, is “actual or imminent.”
II
A
Since the plaintiffs fear interceptions of a kind authorized by § 1881a, it is important to understand just what kind of surveillance that section authorizes. Congress enacted § 1881a in 2008, as an amendment to the pre-existing Foreign Intelligence Surveillance Act of 1978, 50 U. S. C. § 1801 et seq. Before the amendment, the Act authorized the Government (acting within the United States) to monitor private electronic communications between the United States and a foreign country if (1) the Government’s purpose was, in significant part, to obtain foreign intelligence information (which includes information concerning a “foreign power” or “territory” related to our “national defense” or “security” or the “conduct of . . . foreign affairs”), (2) the Government’s surveillance target was “a foreign power or an agent of a foreign power,” and (3) the Government used surveillance procedures designed to “minimize the acquisition and retention, and prohibit the dissemination, of” any private information acquired about Americans. §§ 1801(e), (h), 1804(a).
In addition, the Government had to obtain the approval of the Foreign Intelligence Surveillance Court. To do so, it had to submit an application describing (1) each “specific target,” (2) the “nature of the information sought,” and (3) the “type of communications or activities to be subjected to the surveillance.” § 1804(a). It had to certify that, in significant part, it sought to obtain foreign intelligence information. Ibid. It had to demonstrate probable cause to believe that each specific target was “a foreign power or an agent of a foreign power.” §§ 1804(a), 1805(a). It also had to describe instance-specific procedures to be used to minimize intrusions upon Americans’ privacy (compliance *425 with which the court subsequently could assess). §§ 1804(a), 1805(d)(3).
The addition of § 1881a in 2008 changed this prior law in three important ways. First, it eliminated the requirement that the Government describe to the court each specific target and identify each facility at which its surveillance would be directed, thus permitting surveillance on a programmatic, not necessarily individualized, basis. § 1881a(g). Second, it eliminated the requirement that a target be a “foreign power or an agent of a foreign power.” Ibid. Third, it diminished the court’s authority to insist upon, and eliminated its authority to supervise, instance-specific privacy-intrusion minimization procedures (though the Government still must use court-approved general minimization procedures). § 1881a(e). Thus, using the authority of § 1881a, the Government can obtain court approval for its surveillance of electronic communications between places within the United States and targets in foreign territories by showing the court (1) that “a significant purpose of the acquisition is to obtain foreign intelligence information,” and (2) that it will use general targeting and privacy-intrusion minimization procedures of a kind that the court had previously approved. § 1881a(g).
B
It is similarly important to understand the kinds of communications in which the plaintiffs say they engage and which they believe the Government will intercept. Plaintiff Scott McKay, for example, says in an affidavit (1) that he is a lawyer; (2) that he represented “Mr. Sami Omar Al-Hussayen, who was acquitted in June 2004 on terrorism charges”; (3) that he continues to represent “Mr. Al-Hussayen, who, in addition to facing criminal charges after September 11, was named as a defendant in several civil cases”; (4) that he represents Khalid Sheik Mohammed, a detainee, “before the Military Commissions at Guantánamo Bay, Cuba”; (5) that in representing these clients he “commu- *426 nicatefe] by telephone and email with people outside the United States, including Mr. Al-Hussayen himself,” “experts, investigators, attorneys, family members ... and others who are located abroad”; and (6) that prior to 2008 “the U. S. government had intercepted some 10,000 telephone calls and 20,000 email communications involving [his client] Al-Hussayen.” App. to Pet. for Cert. 369a-371a.
Another plaintiff, Sylvia Royce, says in her affidavit (1) that she is an attorney; (2) that she “represent^] Moham-medou Ould Salahi, a prisoner who has been held at Guantá-namo Bay as an enemy combatant”; (3) that, “[i]n connection with [her] representation of Mr. Salahi, [she] received] calls from time to time from Mr. Salahi’s brother,... a university student in Germany”; and (4) that she has been told that the Government has threatened Salahi “that his family members would be arrested and mistreated if he did not cooperate.” Id., at 349a-351a.
The plaintiffs have noted that McKay no longer represents Mohammed and Royce no longer represents Ould Salahi. Brief for Respondents 15, n. 11. But these changes are irrelevant, for we assess standing as of the time a suit is filed, see Davis v. Federal Election Comm’n, 554 U. S. 724, 734 (2008), and in any event McKay himself continues to represent Al Hussayen, his partner now represents Mohammed, and Royce continues to represent individuals held in the custody of the U. S. military overseas.
A third plaintiff, Joanne Mariner, says in her affidavit (1) that she is a human rights researcher; (2) that “some of the work [she] do[es] involves trying to track down people who were rendered by the CIA to countries in which they were tortured”; (3) that many of those people “the CIA has. said are (or were) associated with terrorist organizations”; and (4) that, to do this research, she “communicate[s] by telephone and e-mail with . . . former detainees, lawyers for detainees, relatives of detainees, political activists, journalists, and fixers” “all over the world, including in Jordan, Egypt, Paki *427 stan, Afghanistan, [and] the Gaza Strip.” App. to Pet. for Cert. 343a-344a.
Other plaintiffs, including lawyers, journalists, and human rights researchers, say in affidavits (1) that they have jobs that require them to gather information from foreigners located abroad; (2) that they regularly communicate electronically (e. g., by telephone or e-mail) with foreigners located abroad; and (3) that in these communications they exchange “foreign intelligence information” as the Act defines it. Id., at 334a-375a.
HH H-I
Several considerations, based upon the record along with commonsense inferences, convince me that there is a very high likelihood that the Government, acting under the authority of § 1881a, will intercept at least some of the communications just described. First, the plaintiffs have engaged, and continue to engage, in electronic communications of a kind that the 2008 amendment, but not the prior Act, authorizes the Government to intercept. These communications include discussions with family members of those detained at Guantanamo, friends and acquaintances of those persons, and investigators, experts, and others with knowledge of circumstances related to terrorist activities. These persons are foreigners located outside the United States. They are not “foreign power[s]” or “agent[s] of . . . foreign powerfe].” And the plaintiffs state that they exchange with these persons “foreign intelligence information,” defined to include information that “relates to” “international terrorism” and “the national defense or the security of the United States.” See 50 U. S. C. § 1801 (2006 ed. and Supp. V); see, e. g., App. to Pet. for Cert. 342a, 366a, 373a-374a.
Second, the plaintiffs have a strong motive to engage in, and the Government has a strong motive to listen to, conversations of the kind described. A lawyer representing a client normally seeks to learn the circumstances surrounding the crime (or the civil wrong) of which the client is accused. *428 A fair reading of the affidavit of Scott McKay, for example, taken together with elementary considerations of a lawyer’s obligation to his client, indicates that McKay will engage in conversations that concern what suspected foreign terrorists, such as his client, have done; in conversations that concern his clients’ families, colleagues, and contacts; in conversations that concern what those persons (or those connected to them) have said and done, at least in relation to terrorist activities; in conversations that concern the political, social, and commercial environments in which the suspected terrorists have lived and worked; and so forth. See, e. g., id., at 373a~374a. Journalists and human rights workers have strong similar motives to conduct conversations of this kind. See, e. g., id., at 342a (declaration of Joanne Mariner, stating that “some of the information [she] exchangefs] by telephone and e-mail relates to terrorism and counterterrorism, and much of the information relates to the foreign affairs of the United States”).
At the same time, the Government has a strong motive to conduct surveillance of conversations that contain material of this kind. The Government, after all, seeks to learn as much as it can reasonably learn about suspected terrorists (such as those detained at Guantanamo), as well as about their contacts and activities, along with those of friends and family members. See Executive Office of the President, Office of Management and Budget, Statement of Administration Policy on S. 2248, p. 4 (Dec. 17, 2007) (“Part of the value of the [new authority] is to enable the Intelligence Community to collect expeditiously the communications of terrorists in foreign countries who may contact an associate in the United States”). And the Government is motivated to do so, not simply by the desire to help convict those whom the Government believes guilty, but also by the critical, overriding need to protect America from terrorism. See id., at 1 (“Protection of the American people and American interests at home and abroad requires access to timely, accurate, and *429 insightful intelligence on the capabilities, intentions, and activities of . . . terrorists”).
Third, the Government’s past behavior shows that it has sought, and hence will in all likelihood continue to seek, information about alleged terrorists and detainees through means that include surveillance of electronic communications. As just pointed out, plaintiff Scott McKay states that the Government (under the authority of the pre-2008 law) “intercepted some 10,000 telephone calls and 20,000 email communications involving [his client] Mr. Al-Hussayen.” App. to Pet. for Cert. 370a.
Fourth, the Government has the capacity to conduct electronic surveillance of the kind at issue. To some degree this capacity rests upon technology available to the Government. See 1 D. Kris & J. Wilson, National Security Investigations & Prosecutions § 16:6, p. 562 (2d ed. 2012) (“NSA’s technological abilities are legendary”); id., § 16:12, at 572-577 (describing the National Security Agency’s capacity to monitor “very broad facilities” such as international switches). See, e. g., Lichtblau & Risen, Spy Agency Mined Vast Data Trove, Officials Report, N. Y. Times, Dec. 24,' 2005, p. A1 (describing capacity to trace and to analyze large volumes of communications into and out of the United States); Lichtblau & Shane, Bush Is Pressed Over New Report on Surveillance, N. Y. Times, May 12, 2006, p. A1 (reporting capacity to obtain access to records of many, if not most, telephone calls made in the United States); Priest & Arkin, A Hidden World, Growing Beyond Control, Washington Post, July 19, 2010, p. A1 (reporting that every day, collection systems at the National Security Agency intercept and store 1.7 billion e-mails, telephone calls, and other types of communications). Cf. Statement of Administration Policy on S. 2248, supra, at 3 (rejecting a provision of the Senate bill that would require intelligence analysts to count “the number of persons located in the United States whose communications were reviewed” as “impossible to implement” (internal quotation marks *430 omitted)). This capacity also includes the Government’s authority to obtain the kind of information here at issue from private carriers such as AT&T and Verizon. See 50 U. S. C. § 1881a(h). We are farther told by amici that the Government is expanding that capacity. See Brief for Electronic Privacy Information Center et al. 22-23 (National Security Agency will be able to conduct surveillance of most electronic communications between domestic and foreign points).
Of course, to exercise this capacity the Government must have intelligence court authorization. But the Government rarely files requests that fail to meet the statutory criteria. See Letter from Ronald Weich, Assistant Attorney General, to Joseph R. Biden, Jr., 1 (Apr. 30, 2012) (In 2011, of the 1,676 applications to the intelligence court, 2 were withdrawn by the Government, and the remaining 1,674 were approved, 30 with some modification), online at http://www.justice.gov/ nsd/foia/foia_library/2011fisa-ltr.pdf. (as visited Feb. 22, 2013, and available in Clerk of Court’s case file). As the intelligence court itself has stated, its review under § 1881a is “ ‘narrowly circumscribed.’ ” In re Proceedings Required by § 702(i) of the FISA Amendments Act of 2008, No. Mise. 08-01 (Aug. 27, 2008), p. 3. There is no reason to believe that the communications described would all fail to meet the conditions necessary for approval. Moreover, compared with prior law, § 1881a simplifies and thus expedites the approval process, making it more likely that the Government will use § 1881a to obtain the necessary approval.
The upshot is that (1) similarity of content, (2) strong motives, (3) prior behavior, and (4) capacity all point to a very strong likelihood that the Government will intercept at least some of the plaintiffs’ communications, including some that the 2008 amendment, § 1881a, but not the pre-2008 Act, authorizes the Government to intercept.
At the same time, nothing suggests the presence of some special factor here that might support a contrary conclusion. *431 The Government does not deny that it has both the motive and the capacity to listen to communications of the kind described by the plaintiffs. Nor does it describe any system for avoiding the interception of an electronic communication that happens to include a party who is an American lawyer, journalist, or human rights worker. One can, of course, always imagine some special circumstance that negates a virtual likelihood, no matter how strong. But the same is true about most, if not all, ordinary inferences about future events. Perhaps, despite pouring rain, the streets will remain dry (due to the presence of a special chemical). But ordinarily a party that seeks to defeat a strong natural inference must bear the burden of showing that some such special circumstance exists. And no one has suggested any such special circumstance here.
Consequently, we need only assume that the Government is doing its job (to find out about, and combat, terrorism) in order to conclude that there is a high probability that the Government will intercept at least some electronic communication to which at least some of the plaintiffs are parties. The majority is wrong when it describes the harm threatened the plaintiffs as “speculative.”
IY
A
The majority more plausibly says that the plaintiffs have failed to show that the threatened harm is “certainly impending.” Ante, at 409 (internal quotation marks omitted). But, as the majority appears to concede, see ante, at 414, and n. 5, certainty is not, and never has been, the touchstone of standing. The future is inherently uncertain. Yet federal courts frequently entertain actions for injunctions and for declaratory relief aimed at preventing future activities that are reasonably likely or highly likely, but not absolutely certain, to take place. And that degree of certainty is all that is needed to support standing here.
*432 The Court’s use of the term “certainly impending” is not to the contrary. Sometimes the Court has used the phrase “certainly impending” as if the phrase described a sufficient, rather than a necessary, condition for jurisdiction. See Pennsylvania v. West Virginia, 262 U. S. 553, 593 (1923) (“If the injury is certainly impending that is enough”). See also Babbitt, 442 U. S., at 298 (same). On other occasions, it has used the phrase as if it concerned when, not whether, an alleged injury would occur. Thus, in Lujan, 504 U. S., at 564, n. 2, the Court considered a threatened future injury that consisted of harm that the plaintiffs would suffer when they “soon” visited a government project area that (they claimed) would suffer environmental damage. The Court wrote that a “mere profession of an intent, some day, to return” to the project area did not show the harm was “imminent,” for “soon” might mean nothing more than “in this lifetime.” Id., at 564-565, n. 2 (internal quotation marks omitted). Similarly, in McConnell v. Federal Election Comm’n, 540 U. S. 93 (2003), the Court denied standing because the Senator’s future injury (stemming from a campaign finance law) would not affect him until his reelection. That fact, the Court said, made the injury “too remote temporally to satisfy Article III standing.” Id., at 225-226.
On still other occasions, recognizing that “‘imminence’ is concededly a somewhat elastic concept,” Lujan, supra, at 565, n. 2, the Court has referred to, or used (sometimes along with “certainly impending”), other phrases such as “reasonable probability” that suggest less than absolute, or literal, certainty. See Babbitt, supra, at 298 (plaintiff “must demonstrate a realistic danger of sustaining a direct injury” (emphasis added)); Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U. S. 167, 190 (2000) (“[I]t is the plaintiff’s burden to establish standing by demonstrating that... the defendant’s allegedly wrongful behavior will likely occur or continue”). See also Monsanto Co. v. Geertson Seed Farms, 561 U. S. 139, 153 (2010) (“ ‘ “reason *433 able probability” ’ ” and “substantial risk”); Davis, 554 U. S., at 734 (“realistic and impending threat of direct injury”); MedImmune, Inc. v. Genentech, Inc., 549 U. S. 118, 129 (2007) (“genuine threat of enforcement”); Department of Commerce v. United States House of Representatives, 525 U. S. 316, 333 (1999) (“substantially likely” (internal quotation marks omitted)); Clinton v. City of New York, 524 U. S. 417, 432 (1998) (“sufficient likelihood of economic injury”); Pennell v. San Jose, 485 U. S. 1, 8 (1988) (“realistic danger” (internal quotation marks omitted)); Blum v. Yaretsky, 457 U. S. 991, 1001 (1982) (“quite realistic” threat); Bryant v. Yellen, 447 U. S. 352, 367-368 (1980) (“likely”); Buckley v. Valeo, 424 U. S. 1, 74 (1976) (per curiam) (“reasonable probability”). Taken together the case law uses the word “certainly” as if it emphasizes, rather than literally defines, the immediately following term “impending.”
B
1
More important, the Court’s holdings in standing cases show that standing exists here. The Court has often found standing where the occurrence of the relevant injury was far less certain than here. Consider a few, fairly typical, cases. Consider Pennell, supra. A city ordinance forbade landlords to raise the rent charged to a tenant by more than 8 percent where doing so would work an unreasonably severe hardship on that tenant. Id., at 4-5. A group of landlords sought a judgment declaring the ordinance unconstitutional. The Court held that, to have standing, the landlords had to demonstrate a “ ‘realistic danger of sustaining a direct injury as a result of the statute’s operation.’ ” Id., at 8 (emphasis added). It found that the landlords had done so by showing a likelihood of enforcement and a “probability,” ibid., that the ordinance would make the landlords charge lower rents—even though the landlords had not shown (1) that they intended to raise the relevant rents to the point of *434 causing unreasonably severe hardship; (2) that the tenants would challenge those increases; or (3) that the city’s hearing examiners and arbitrators would find against the landlords. Here, even more so than in Pennell, there is a “realistic danger” that the relevant harm will occur.
Or, consider Blum, supra. A group of nursing home residents receiving Medicaid benefits challenged the constitutionality (on procedural grounds) of a regulation that permitted their nursing home to transfer them to a less desirable home. Id., at 999-1000. Although a Medicaid committee had recommended transfers, Medicaid-initiated transfer had been enjoined and the nursing home itself had not threatened to transfer the plaintiffs. But the Court found “standing” because “the threat of transfers” was “not ‘imaginary or speculative’” but “quite realistic,” hence “sufficiently substantial.” Id., at 1000-1001 (quoting Younger v. Harris, 401 U. S. 37, 42 (1971)). The plaintiffs’ injury here is not imaginary or speculative, but “quite realistic.”
Or, consider Davis, supra. The plaintiff, a candidate for the United States House of Representatives, self-financed his campaigns. He challenged the constitutionality of an election law that relaxed the limits on an opponent’s contributions when a self-financed candidate’s spending itself exceeded certain other limits. His opponent, in fact, had decided not to take advantage of the increased contribution limits that the statute would have allowed. Id., at 734. But the Court nonetheless found standing because there was a “realistic and impending threat,” not a certainty, that the candidate’s opponent would do so at the time the plaintiff filed the complaint. Id., at 734-735. The threat facing the plaintiffs here is as “realistic and impending.”
Or, consider MedImmune, supra. The plaintiff, a patent licensee, sought a declaratory judgment that the patent was invalid. But, the plaintiff did not face an imminent threat of suit because it continued making royalty payments to the patent holder. In explaining why the plaintiff had standing, *435 we (1) assumed that if the plaintiff stopped making royalty-payments it would have standing (despite the fact that the patent holder might not bring suit), (2) rejected the Federal Circuit’s “reasonable apprehension of imminent suit” requirement, and (3) instead suggested that a “genuine threat of enforcement” was likely sufficient. Id., at 128,129, 132, n. 11 (internal quotation marks omitted). A “genuine threat” is present here.
Moreover, courts have often found probabilistic injuries sufficient to support standing. In Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U. S. 59 (1978), for example, the plaintiffs, a group of individuals living near a proposed nuclear powerplant, challenged the constitutionality of the Price-Anderson Act, a statute that limited the plant’s liability in the case of a nuclear accident. The plaintiffs said that, without the Act, the defendants would not build a nuclear plant. And the building of the plant would harm them, in part, by emitting “non-natural radiation into [their] environment.” Id., at 74. The Court found standing in part due to “our generalized concern about exposure to radiation and the apprehension flowing from the uncertainty about the health and genetic consequences of even small emissions.” Ibid, (emphasis added). See also Monsanto Co., 561 U. S., at 153-154 (“A substantial risk of gene flow injures respondents in several ways” (emphasis added)).
See also lower court cases, such as Mountain States Legal Foundation v. Glickman, 92 F. 3d 1228, 1234-1235 (CADC 1996) (plaintiffs attack Government decision to limit timber harvesting; standing based upon increased risk of wildfires); Natural Resources Defense Council v. EPA, 464 F. 3d 1, 7 (CADC 2006) (plaintiffs attack Government decision deregulating methyl bromide; standing based upon increased lifetime risk of developing skin cancer); Constellation Energy Commodities Group, Inc. v. FERC, 457 F. 3d 14, 20 (CADC 2006) (standing based on increased risk of nonreeovery inherent in the reduction of collateral securing a debt of uncer *436 tain amount); Sutton v. St. Jude Medical S. C., Inc., 419 F. 3d 568, 570-575 (CA6 2005) (standing based on increased risk of harm caused by implantation of defective medical device); Johnson v. Allsteel, Inc., 259 F. 3d 885, 888-891 (CA7 2001) (standing based on increased risk that Employee Retirement Income Security Act of 1974 beneficiary will not be covered due to increased amount of discretion given to ERISA administrator).
How could the law be otherwise? Suppose that a federal court faced a claim by homeowners that (allegedly) unlawful dam-building practices created a high risk that their homes would be flooded. Would the court deny them standing on the ground that the risk of flood was only 60, rather than 90, percent?
Would federal courts deny standing to a plaintiff in a diversity action who claims an anticipatory breach of contract where the future breach depends on probabilities? The defendant, say, has threatened to load wheat onto a ship bound for India despite a promise to send the wheat to the United States. No one can know for certain that this will happen. Perhaps the defendant will change his mind; perhaps the ship will turn and head for the United States. Yet, despite the uncertainty, the Constitution does not prohibit a federal court from hearing such a claim. See 23 R. Lord, Williston on Contracts §63:35 (4th ed. 2002) (plaintiff may bring an anticipatory breach suit even though the defendant’s promise is one to perform in the future, it has not yet been broken, and defendant may still retract the repudiation). E. g., Wisconsin Power & Light Co. v. Century Indemnity Co., 130 F. 3d 787, 792-793 (CA7 1997) (plaintiff could sue insurer that disclaimed liability for all costs that would be incurred in the future if environmental agencies required cleanup); Combs v. International Ins. Co., 354 F. 3d 568, 598-601 (CA6 2004) (similar).
Would federal courts deny standing to a plaintiff who seeks to enjoin as a nuisance the building of a nearby pond *437 which, the plaintiff believes, will very likely, but not inevitably, overflow his land? See 42 Am. Jur. 2d, Injunctions §§2, 5 (2010) (noting that an injunction is ordinarily preventive in character and restrains actions that have not yet been taken, but threaten injury). E. g., Central Delta Water Agency v. United States, 306 F. 3d 938, 947-950 (CA9 2002) (standing to seek injunction where method of operating dam was highly likely to severely hamper plaintiffs’ ability to grow crops); Consolidated Companies, Inc. v. Union Pacific R. Co., 499 F. 3d 382, 386 (CA5 2007) (standing to seek injunction requiring cleanup of land adjacent to plaintiff’s tract because of threat that contaminants might migrate to plaintiff’s tract).
Neither do ordinary declaratory judgment actions always involve the degree of certainty upon which the Court insists here. See, e. g., Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U. S. 270, 273 (1941) (insurance company could seek declaration that it need not pay claim against insured automobile driver who was in an accident even though the driver had not yet been found liable for the accident); Aetna Life Ins. Co. v. Haworth, 300 U. S. 227, 239-244 (1937) (insurance company could seek declaration that it need not pay plaintiff for disability although plaintiff had not yet sought disability payments). See also, e. g., Associated Indemnity Corp. v. Fairchild Industries, Inc., 961 F. 2d 32, 35-36 (CA2 1992) (insured could seek declaration that insurance company must pay liability even before insured found liable).
2
In some standing cases, the Court has found that a reasonable probability of future injury comes accompanied with present injury that takes the form of reasonable efforts to mitigate the threatened effects of the future injury or to prevent it from occurring. Thus, in Monsanto Co., 561 U. S., at 153-156, the plaintiffs, a group of conventional alfalfa growers) challenged an agency decision to deregulate genetically *438 engineered alfalfa. They claimed that deregulation would harm them because their neighbors would plant the genetically engineered seed, bees would obtain pollen from the neighbors’ plants, and the bees would then (harmfully) contaminate their own conventional alfalfa with the genetically modified gene. The lower courts had found a “reasonable probability” that this injury would occur. Ibid, (internal quotation marks omitted).
Without expressing views about that probability, we found standing because the plaintiffs would suffer present harm by trying to combat the threat. Ibid. The plaintiffs, for example, “would have to conduct testing to find out whether and to what extent their crops have been contaminated.” Id., at 154. And they would have to take “measures to minimize the likelihood of potential contamination and to ensure an adequate supply of non-genetically-engineered alfalfa.” Ibid. We held that these “harms, which [the plaintiffs] will suffer even if their crops are not actually infected with” the genetically modified gene, “are sufficiently concrete to satisfy the injury-in-fact prong of the constitutional standing analysis.” Id., at 155.
Virtually identical circumstances are present here. Plaintiff McKay, for example, points out that, when he communicates abroad about, or in the interests of, a client (e. g., a client accused of terrorism), he must “make an assessment” whether his “client’s interest would be compromised” should the Government “acquire the communications.” App. to Pet. for Cert. 375a. If so, he must either forgo the communication or travel abroad. Id., at 371a-372a (“I have had to take measures to protect the confidentiality of information that I believe is particularly sensitive,” including “travel that is both time-consuming and expensive”).
Since travel is expensive, since forgoing communication can compromise the client’s interests, since McKay’s assessment itself takes time and effort, this case does not differ significantly from Monsanto. And that is so whether we *439 consider the plaintiffs’ present necessary expenditure of time and effort as a separate concrete, particularized, imminent harm, or consider it as additional evidence that the future harm (an interception) is likely, to occur. See also Friends of the Earth, Inc., 528 U. S., at 183-184 (holding that plaintiffs who curtailed their recreational activities on a river due to reasonable concerns about the effect of pollutant discharges into that river had standing); Meese v. Keene, 481 U. S. 465, 475 (1987) (stating that “the need to take ... affirmative steps to avoid the risk of harm . . . constitutes a cognizable injury”).
3
The majority cannot find support in cases that use the words “certainly impending” to deny standing. While I do not claim to have read every standing case, I have examined quite a few, and not yet found any such case. The majority refers to Whitmore v. Arkansas, 495 U. S. 149 (1990). But in that case the Court denied standing to a prisoner who challenged the validity of a death sentence given to a different prisoner who refused to challenge his own sentence. The plaintiff feared that in the absence of an appeal, his fellow prisoner’s death sentence would be missing from the State’s death penalty database and thereby skew the database against him, making it less likely his challenges to his own death penalty would succeed. The Court found no standing. Id., at 161. But the fellow prisoner’s lack of appeal would have harmed the plaintiff only if (1) the plaintiff separately obtained federal habeas relief and was then recon-victed and resentenced to death, (2) he sought review of his new sentence, and (3) during that review, his death sentence was affirmed only because it was compared to an artificially skewed database. Id., at 156-157. These events seemed not very likely to occur.
In Daimler Chrysler Corp. v. Cuno, 547 U. S. 332 (2006), taxpayers challenged the constitutionality of a tax break offered by state and local governments to a car manufacturer. *440 We found no standing. But the plaintiffs would have suffered resulting injury only if the tax break had depleted state and local treasuries and the legislature had responded by raising their taxes. Id., at 344.
In Lujan, the case that may come closest to supporting the majority, the Court also found no standing. But, as I pointed out, supra, at 432, Lujan is a case where the Court considered when, not whether, the threatened harm would occur. 504 U. S., at 564, n. 2. The relevant injury there consisted of a visit by an environmental group’s members to a project site where they would find (unlawful) environmental depredation. Id., at 564. The Court pointed out that members had alleged that they would visit the project sites “soon.” But it wrote that “soon” might refer to almost any time in the future. Ibid., n. 2. By way of contrast, the ongoing threat of terrorism means that here the relevant interceptions will likely take place imminently, if not now.
The Court has, of course, denied standing in other cases. But they involve injuries less likely, not more likely, to occur than here. In a recent case, Summers v. Earth Island Institute, 555 U. S. 488 (2009), for example, the plaintiffs challenged a regulation exempting certain timber sales from public comment and administrative appeal. The plaintiffs claimed that the regulations injured them by interfering with their esthetic enjoyment and recreational use of the forests. The Court found this harm too unlikely to occur to support standing. Id., at 496. The Court noted that one plaintiff had not pointed to a specific affected forest that he would visit. The Court concluded that “[tjhere may be a chance, but . . . hardly a likelihood,” that the plaintiff’s “wanderings will bring him to a parcel about to be affected by a project unlawfully subject to the regulations.” Id., at 495 (emphasis added).
4
In sum, as the Court concedes, see ante, at 414, and n. 5, the word “certainly” in the phrase “certainly impending” *441 does not refer to absolute certainty. As our case law demonstrates, what the Constitution requires is something more akin to “reasonable probability” or “high probability.” The use of some such standard is all that is necessary here to ensure the actual concrete injury that the Constitution demands. The considerations set forth in Parts II and III, supra, make clear that the standard is readily met in this case.
⅜ * *
While I express no view on the merits of the plaintiffs’ constitutional claims, I do believe that at least some of the plaintiffs have standing to make those claims. I dissent, with respect, from the majority’s contrary conclusion.